922 F.2d 836
 136 L.R.R.M. (BNA) 2152
 Unpublished Disposition
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
SOUTHERN MARYLAND HOSPITAL CENTER, Respondent.
 No. 90-2625.
 United States Court of Appeals, Fourth Circuit.
 Argued Nov. 1, 1990.
Decided Jan. 7, 1991.
 
 On Application for Enforcement of an Order of the National Labor Relations Board. (5-CA-18340)
 Joseph Anthony Oertel, National Labor Relations Board, Washington, D.C., (argued) for petitioner;
 Warren Malcolm Davison, Littler, Mendelson, Fastiff & Tichy, Baltimore, Md., (argued) for respondent; John W. Kyle, Littler, Mendelson, Fastiff & Tichy, Blatimore, Md., for Respondent. Jerry M. Hunter, General Counsel, Robert E. Allen, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, National Labor Relations Board, Washington, D.C., on brief.
 N.L.R.B.
 ENFORCEMENT GRANTED.
 Before PHILLIPS, Circuit Judge, BUTZNER, Senior Circuit Judge, and HIRAM H. WARD, Senior United States District Judge for the Middle District of North Carolina, Sitting by Designation.
 PHILLIPS, Circuit Judge:
 
 
 1
 The National Labor Relations Board (NLRB or Board) seeks enforcement of its order that the Southern Maryland Hospital Center (Southern Maryland or Hospital) violated sections 8(a)(1) and (a)(3) of the National Labor Relations Act when it took adverse personnel actions against a Registered Nurse (RN), Alice Thomas, because she engaged in protected activities. The Board also found that the Hospital management violated section 8(a)(1) when its chief executive officer, Dr. Francis Chiaramonte, made threatening statements to Thomas and other employees because of their union activities. Because on the record as a whole there is substantial support for the findings of the Board, we grant enforcement.
 
 
 2
 * When the alleged unfair labor practices took place, Thomas had been employed as a permanent operating room (OR) RN by the Hospital for eight years. She had been rated "very competent" in her most recent evaluation and generally was considered a good OR nurse. The Board found that during her tenure at Southern Maryland, Thomas had been active in supporting the union.[1] In the 1981 organizing drive, she had signed an authorization card, passed out union cards, attended union meetings, and told a hospital administrator, "I support the union wholeheartedly." In 1983 and 1984, during the last organizing effort, she served on the union's organizing committee, wore on her scrub clothing a badge identifying her as "Organizing Committee," wore this badge in the presence of Chiaramonte, the Hospital's owner and chief officer, and distributed union literature and cards. In the most recent concerted activity, described below, she was a leader.
 
 
 3
 In the spring of 1986, Thomas and other nurses at the Hospital became concerned that they were being underpaid for time spent "on call." As a result, Thomas and others conducted a survey of area hospitals to compare pay rates, and found that Southern Maryland's pay rate was low. Thomas then authored a letter to Chiaramonte and the personnel director reporting the results of the survey and asking for increased pay. The letter was signed "OR and Recovery Room Staff." However, at a meeting with Chiaramonte in late June, when he refused to pay more to the nurses for "on call" time, Thomas was specifically identified to him as the one who had "put so much effort into this letter." Later that month, the operating room nurses and others threatened a job action if the Hospital did not increase the "on call" pay. On July 10, Chiaramonte averted the job action by agreeing to increase "on call" pay by 50%.
 
 
 4
 Shortly after this successful concerted activity, the Hospital reduced the benefits of Thomas, changed her employment status from permanent to temporary, denied her additional scheduled hours, and finally discharged her. During this interval, Chiaramonte made statements indicating that Thomas and other union supporters were "troublemakers" for trying to bring the union in and that the OR would be a better place if they were gone. Thomas filed a complaint with the NLRB, and the ALJ, after a nine-day hearing, concluded that the Hospital's action against Thomas and the statements by Chiaramonte violated sections 8(a)(1) and (a)(3). The Board adopted the findings of the ALJ in a summary order and directed the Hospital to reinstate Thomas and award back-pay and ordered the Hospital to cease and desist.
 
 
 5
 The Board petitioned for enforcement of its order pursuant to 29 U.S.C. Sec. 160(e).
 
 II
 
 6
 * The Board first found that Chiaramonte, as chief operating officer of the Hospital, made statements violative of section 8(a)(1). Section 8(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights" to engage in concerted activities. 29 U.S.C. Sec. 158. The Board found two particular statements by Chiaramonte were coercive. First, the Board found that on July 22, 1986--two weeks after the OR nurses, including Thomas, forced Chiaramonte through concerted activity to reverse himself and increase "on call" pay--Chiaramonte told an OR technician that this technician, Thomas, and another nurse were "troublemakers" and that he "would like for [them] to be out of the OR." When asked by the technician why he considered them troublemakers, Chiaramonte responded, according to the technician, "because Alice [Thomas] and I was trying to get the [union] in, and ... that he didn't want the union there and he felt like we was trying to run his OR and his hospital." The testimony is not disputed.[2]
 
 
 7
 The second statement the Board found coercive was made around the same time by Chiaramonte to another doctor at a nursing station in the hearing range of employees. Nurse Killingham testified that he heard Chiaramonte tell another doctor that "the operating room would be a better place or a nicer place if three people were gotten rid of, and those people were Alice Thomas, and he said she's a union organizer, and Betty Banks [the OR technician], she has a big mouth, and [he named another nurse]."[3]
 
 
 8
 The Hospital does not directly dispute the Board's reliance on these statements, but instead argues that such statements of general opposition to persons and unions are protected by section 8(c) as nonthreatening expressions of views and opinions. In support, it cites this court's statement from an earlier Southern Maryland Hospital case: "While it is true that Chiaramonte generally showed no love for the unions in his actions, such dislike is not an unfair labor practice." 801 F.2d 666, 671 (4th Cir.1986).
 
 
 9
 Dislike for unions certainly is no unfair labor practice. But an employer's right to state its opinion must be free of any "threat of reprisal or force...." 29 U.S.C. Sec. 158(c). In determining whether particular statements are coercive, the Board must review an employer's speech "in the context of its labor relations setting." J.P. Stevens & Co. v. NLRB, 638 F.2d 676, 687 (4th Cir.1980). Viewed in this setting, we test "not whether the language or acts were coercive in actual fact, but whether the conduct in question had a reasonable tendency in the totality of the circumstances to intimidate." Standard-Coosa-Thatcher Carpet Yarn Div., Inc. v. NLRB, 691 F.2d 1133, 1137 (4th Cir.1982) (quoting NLRB v. PB & S Chemical Co., 567 F.2d 1263, 1267 (4th Cir.1977)).
 
 
 10
 Viewed in this light, the record as a whole supports the Board's finding that Chiaramonte's statements were coercive. These statements were made by the Hospital's highest officer and its owner. The statements were made on the job, and were made either directly to or in the vicinity of employees. In addition, the statements expressly linked the protected activities of the workers with their being "troublemakers" and management's desire to get rid of them. Finally, the statements were made by Chiaramonte, whose opposition to unions has been well documented. See 801 F.2d 666. Such statements, coming on the heels of the concerted action by Thomas and other nurses to force Chiaramonte to grant a 50% increase in "on call" pay, certainly could be found coercive. Accordingly, the Board's Order regarding coercive statements by the Hospital in violation of section 8(a)(1) should be enforced.
 
 B
 
 11
 Relying on this evidence of Chiaramonte's statements, and adding to it Chiaramonte's knowledge of and opposition to Thomas' union and concerted activities, and gleaning further support from subsequent confirming statements, the Board adopted the following finding by the ALJ:
 
 
 12
 I find, after weighing all the evidence, that Dr. Chiaramonte adopted a policy of getting rid of Alice Thomas because he decided that she had been fomenting the call-pay job action and that she was rekindling the union organizing.
 
 
 13
 This finding is crucial to the enforceability of other portions of the Board's order, since it is the premise of its ultimate finding that the Hospital took certain actions designed to get rid of Thomas because of her protected activity. Consequently, since motive is a critical question in section 8(a)(3) cases, we now review whether the Board's conclusion as to Chiaramonte's motive has substantial support.
 
 
 14
 The Board's assessment of the motive of the Hospital is controlled by the Wright Line test of causation. Wright Line, A Division of Wright Line, Inc., 251 N.L.R.B. 1083, 1088-89 (1980), enf'd on other grounds, NLRB v. Wright Line, A Div. of Wright Line, Inc., 662 F.2d 899 (1st Cir.1981); see also NLRB v. Transportation Management Corp., 462 U.S. 393 (1983) (approving Wright Line test); NLRB v. Daniel Construction Co., 731 F.2d 191 (4th Cir.1984) (same). Under Wright Line, if the NLRB General Counsel makes a prima facie case that the employer's opposition to protected activity was "a motivating factor" in an employment decision, then the burden shifts to the employer to show that the same action would have taken place in the absence of the protected conduct. So assessed, the evidence substantially supports the Board's finding of violation.
 
 
 15
 Chiaramonte's statements about Thomas, that she was a troublemaker due to her union activities and that because of this conduct the Hospital would be better off if she were gone, provides primary, and substantial, evidence that Chiaramonte hotly resented and opposed Thomas' organizing and related union activities. Indeed, these statements were deemed coercive, and violative of section 8(a)(1), especially because they reflected the view of management, toward Thomas and others, that support for the union could lead to adverse job actions.
 
 
 16
 Saying the world would be a better place if someone were gone is not the same as adopting a plan to push them out the door. But there is further evidence that Chiaramonte's, hence the Hospital's, anti-union animus was "a motivating factor." First, there is the settled presumption that if an employer holds "an antiunion animus which the [discrimination] would gratify, it may be a fair inference that this was the true reason" for the employer's actions. NLRB v. Joseph Antell, Inc., 358 F.2d 880, 883 (1st Cir.1966). Certainly, the past practices of the Hospital and Chiaramonte, as well as his most recent statements, support a finding of general anti-union animus. Second, Thomas' involvement in the union organizing drives and her role as a leader in the recent concerted activity to get increased "on call" pay make her a likely candidate for retaliation. All of this activity brought her to the attention of Chiaramonte and triggered the "troublemaker" comments and his expressed desire to get her out of the Hospital. Such prior statements against employees who engage in union activities further add to the presumption and support a section 8(a)(3) violation. See, e.g., Herman Brothers, Inc. v. NLRB, 658 F.2d 201, 210 (3d Cir.1981).
 
 
 17
 Third and finally, there is evidence of other statements that confirm the conclusion that Chiaramonte adopted a policy to get rid of Thomas because of her union activities. In one conversation, the head nurse explained the firing of Thomas: "[She] had a history of being a troublemaker ... she tried to bring in the union." In another conversation, Thomas was described this way: "That is the one that was the troublemaker and belonged to the union. She was trying to get the union in.... Yes, she was a very good OR nurse.... [But] the doctor [Chiaramonte] thought she was a troublemaker and that he said he owns the hospital and did not want the union here.... That it was his hospital and he would run it the way he wanted and the union would not tell him what to do."[4]
 
 
 18
 All of this combines to form substantial evidence supporting the Board's finding that the Hospital's opposition to Thomas' protected activity was a motivating factor in the various employment decisions adverse to her, i.e., that a prima facie case had been made as to each. We next assess whether the Board properly concluded, in application of the Wright Line test, that the Hospital had failed to carry its burden of showing that the several adverse employment decisions found violative of the Act would have been made for other reasons than opposition to protected activity.
 
 
 19
 (1)
 
 
 20
 The Board found that the Hospital discriminated against Thomas when it denied her a requested increase in hours scheduled for the OR. Thomas had requested in writing that her scheduled hours be increased from the 36 hours she was scheduled for July and August to 56 hours. On August 20, the head OR nurse told Thomas that personnel director Nieves said that all the full-time positions in the OR had been filled by nurse trainees, and that there was no room for Thomas.
 
 
 21
 The next day, 52 employees, including the head OR nurse, signed a petition asking management to install Thomas as a permanent part-time nurse because of her years of experience and service to the Hospital. The ALJ noted, "There was no response to this petition. I infer that this mass support merely added to Dr. Chiaramonte's apprehension that Thomas' influence over and support among the employees was leading to further union organizing."
 
 
 22
 The Hospital's position, that there was no room for Thomas, is problematic. As the Board credibly found, substantial evidence shows that the Hospital suffered from a chronic shortage of experienced nurses, and that the recently hired nurse trainees could not fill the OR positions for at least several months. In addition, the record is filled with advertisements from the Washington Post that reveal the Hospital was at all relevant times aggressively recruiting full-time nurses. Moreover, the personnel director wrote to Chiaramonte on August 5 and said that there was a "critical need" for additional OR nurses. Also, the Board found that the Hospital continued to hire experienced OR RNs. In fact, three OR nurses were hired on a temporary basis, and one of them testified, credibly for the Board, that the head OR nurse asked her in early September whether she would be willing to work full-time.[5]
 
 
 23
 In sum, this evidence provides substantial support for the conclusion by the Board that the Hospital would not have refused to increase Thomas' hours but for its anti-union animus. The fact that another nurse was offered a full-time position, and that the Hospital continued to recruit full-time experienced OR RNs, supports the Board's conclusion that in the absence of a discriminatory motivation Thomas' request for increased hours would not have been denied. Accordingly, the Board's order with regard to denial of increased hours should be enforced.
 
 
 24
 (2)
 
 
 25
 Less than two weeks after Thomas was denied an increase in hours, personnel director Nieves and the director of nursing met with Thomas and said that her employment status was being changed to temporary, pro re nata ("for the emergencey" or PRN) status, which meant that she lost all her employment rights and would only be called and paid on an "as needed" basis. Thomas was told that the reason for the change was that Thomas had been a temporary employee for four months, and that pursuant to established Hospital personnel policy she had to be moved to PRN status.
 
 
 26
 The record however belies the assertion that Thomas was indeed a temporary employee at this time. Her pay stubs from June-August indicate that she had been a Group 2 employee, which meant permanent part-time with benefits, and she had received no documentation from the Hospital indicating a change in status or lost benefits. Despite this, personnel director Nieves claimed at the hearing that it was his understanding that Thomas had been in a temporary position since June. For support, Nieves pointed to a personnel action request dated June 16 as evidence that Thomas, back in June, was changed to temporary status and that Thomas' statements to the contrary indicated that she was either misinformed or lying. The Board, however, concluded that Nieves fabricated this testimony and that the personnel action request was actually made in mid-July, but was backdated to mid-June so as to implement the policy of getting rid of Thomas.[6] By backdating it, the Hospital could strip Thomas of her employment benefits and make her terminable almost at will.
 
 
 27
 There assuredly is a quantum of evidence supporting the Board's finding on backdating, but we need not resolve that dispute to review the Board's primary conclusion that the Hospital violated section 8(a)(3) when it changed Thomas' status from permanent part-time to temporary. The reason is that the same facts discussed above which indicate a section 8(a)(3) violation for refusing to increase Thomas' scheduled hours also support a violation for changing her status. During this time, the Hospital continued to advertise for experienced OR RNs in the Washington Post; it continued to hire experienced RNs (indeed, one RN was hired just 5 days after Thomas was shifted to temporary status); and several days after Thomas was shifted to temporary status the head nurse offered a full-time position to a newly hired nurse. Moreover, competent evidence indicated that a PRN nurse had never been used in the operating room. But despite that, after Thomas was made PRN status, she was routinely scheduled for OR duty. All this, coupled with the undisputed evidence that Thomas was "very competent" and "a very good OR nurse," amounts to substantial evidence supporting the Board's finding that the Hospital's action in changing Thomas to temporary status was guided by discriminatory motivation.
 
 
 28
 The Hospital failed to carry its burden that such action had any grounding other than discrimination. Its argument that the action comported with established personnel policy fails to convince, since Thomas' pay stubs for this period indicate that she was not a temporary employee. Consequently, even if we were to accept the Hospital's assertion that the personnel action request was not backdated, the Board's ultimate finding on motivation as to this employment decision would still be substantially supported. Therefore, the Board's order regarding Thomas' change from permanent to temporary status should be enforced.
 
 
 29
 (3)
 
 
 30
 The Board found that two months after Thomas had been classified as a temporary employee and nearly ten weeks after she had been denied an increase in scheduled hours, Thomas continued to be employed as an OR RN. The head OR nurse had continued to schedule Thomas for OR hours, and her September-November OR schedule shows that Thomas was scheduled to work two shifts every week (18 hours), as she had been working since June. All this was despite the fact that heretofore a temporary nurse had rarely if ever been used in OR. This powerfully suggests that the only thing that had changed about Thomas was her group classification--she had been bumped down two notches--while her work schedule had stayed relatively steady since June.
 
 
 31
 On November 7, the head OR nurse issued an OR schedule for November, and this schedule included no hours for Thomas. When Thomas asked the head nurse why she could not work more, she replied, "Alice, I am told that if you have any problems with your schedule, you are to see Mr. Nieves [the personnel director]. He is handling your schedule." (The Board discredited Nieves' denial of any involvement in OR scheduling, since Nieves generally lacked all credibility, in the eyes of the Board. See note 3, supra.) The head OR nurse further explained that Thomas was PRN and that as such she should not expect a regular schedule of hours.
 
 
 32
 Based on this statement, and the evidence discussed above, the Board found that Nieves' refusal to schedule Thomas on the November OR schedule was motivated by his determination to carry out Dr. Chiaramonte's policy of getting rid of Thomas and therefore violated sections 8(a)(1) and (a)(3). Substantial evidence supporting the Board's conclusion comes from the same sources earlier identified. The Hospital continued to experience a shortage of OR nurses; it continued to advertise in the Washington Post for nurses; and Thomas remained a "very competent" and "very good OR nurse" who could be put to use in the OR. Adding to this is the largely undisputed evidence that the Hospital refused to let Thomas work as a substitute for three RNs in the OR who wanted a day off. Though the Hospital claims that such reluctance to let Thomas substitute is "wholly understandable" since Thomas was not always available when the head nurse needed her, that argument is unpersuasive since other nurses' schedule were being accommodated. The Hospital attempts to skirt this entire issue by asserting that staffing decisions at a Hospital should not be subject to close review, that Thomas was not scheduled because she had not responded to requests earlier in the summer to increase her hours, and that the staff budget at the Hospital allowed no room for Thomas. As shown above, these contentions do not call into serious doubt the substantiality of the evidence relied on by the Board. Accordingly, the Board's order on elimination of scheduled hours should be enforced.
 
 
 33
 (4)
 
 
 34
 A few weeks after the last described incident, Thomas was discharged by the Hospital for failing to assist a doctor perform an after-hours elective surgery. The basis of her discharge was hotly disputed. The Hospital argues that whatever else it may have done against Thomas, and whatever general anti-union animus it harbored, that it had good reason to dismiss her, for she failed on November 18 to assist a doctor in the after-hours elective surgery. On the other hand, the Board found the discharge for refusing to assist the operation pretextual, since the Board found (1) another nurse who also refused to assist the same doctor was not discharged; (2) Thomas was under no professional or ethical obligation to assist the doctor in this particular case since the surgery was elective and not an "emergency"; (3) Thomas had good reason, professionally and ethically, not to assist the doctor in the elective surgery since she was scheduled to handle "on call" emergency surgeries; and (4) director of personnel Nieves, whom the Board found was determined to get rid of Thomas, played a "decisive role" in the decision to discharge Thomas.
 
 
 35
 The Hospital seems to argue that refusal by a nurse to assist in an operation upon request of a doctor is per se a protected employer decision under the Wright-Line test. While such a basis for decision is obviously one deserving of careful consideration, no such per se rule can be adopted. Motivation must still be assessed; pretext may obviously be in play in this circumstance as in any other. As the ALJ put it, "Of course, if a hospital were not discriminatorily motivated, it could lawfully discharge a nurse for refusing to assist a surgeon in performing either an emergency or nonemergency operation."
 
 
 36
 Here, as a matter of fact, the Hospital's own conduct belies the general principle for which it contends. The same charge nurse who asked Thomas to assist in the operation also asked another RN, who refused because the surgery was an "add-on" case, one not previously scheduled, and it was not considered an emergency. Yet the Hospital did not reprimand or even write up this RN about her refusal, either at the time of refusal or since, though Thomas was discharged for refusing to assist the same surgery.
 
 
 37
 Furthermore, Thomas' refusal to assist the surgery did not trigger an immediate response. The nurse in charge, a peer of Thomas, asked Thomas twice to assist in the surgery, but Thomas continued to refuse because she was the "on call" nurse and had to be ready for emergency procedures. (Thomas testified that she said if the doctor declared the surgery an "emergency" then she would have immediately assisted the surgery, because then it would have become her responsibility. The doctor, however, declined to declare it an emergency.) The Board noted that the charge nurse made no objection to Thomas on the evening of the surgery, and did not write an incident report that evening on Thomas or the other RN who refused to assist the surgery. Moreover, the Board found that the charge nurse was reluctant to write up the incident (the Hospital claims it was due to her concern for Thomas) and only filed an incident report under pressure from the personnel director. No report was ever filed against the other RN who refused.
 
 
 38
 Another finding important to the Board's conclusion is the role played by Nieves. Substantial evidence supports the conclusion that Nieves, as personnel director, played an active role in the discharge of Thomas. Since the Board credibly found that Nieves was determined to implement Chiaramonte's decision to get rid of Thomas, his role in the discharge decision only adds weight to the conclusion that the Hospital's actions were motivated by discrimination.
 
 
 39
 This is the most difficult issue presented for our review. A hospital or any employer generally has the right to fire employees who fail to perform their assigned tasks. But in assessing the actions of this employer we cannot be blind to what took place leading up to it. Viewed in total context, the Hospital's discharge of Thomas was a decision which appears almost pre-ordained once a sufficiently strong ostensible reason developed. We perceive that this is the way the Board assessed the evidence and we are satisfied that its ultimate finding of impermissible motivation for this decision, like the earlier less drastic ones, is substantially supported on the record as a whole. Accordingly, the Board's order should be enforced as to this employment decision.
 
 
 40
 ENFORCEMENT GRANTED.
 
 
 
 [1]
 There was an organizing drive in 1981 at the Hospital, which resulted in the Board's finding that Chiaramonte violated section 8(a)(1) by soliciting employees' grievances and granting benefits, restricting employees' access to union organizers during nonworking hours, threatening employees with discharge because of their union activities, and threatening to kill an employee because he distributed union literature. This court enforced the Board's order in part. See Southern Maryland Hosp. Center v. NLRB, 801 F.2d 666 (4th Cir.1986). A second organizing drive followed in 1983 and 1984. Two ULP proceedings followed from this organizing effort, and this court enforced in part and refused to enforce in part both of the Board's orders against the Hospital. See Southern Maryland Hosp. Center v. NLRB, 875 F.2d 316 (4th Cir.1989) (table) (No. 88-2614); Southern Maryland Hosp. Center v. NLRB, --- F.2d ----, No. 89-2476 (4th Cir.1990)
 
 
 [2]
 The Board credited this testimony since the ALJ found the technician to be "an honest witness" and that her testimony "is undenied on the record." The ALJ here notes: "Without explanation, Dr. Chiaramonte failed to testify." J.A. at 97
 
 
 [3]
 J.A. at 38. To credit this testimony, the Board had to make a credibility determination between RN Killingham and Dr. Carlini, who gave a blanket denial of ever having such a discussion with Chiaramonte. The ALJ found that "[b]y their demeanor, Killingham impressed me as a more trustworthy witness than Dr. Carlini, a former hunting companion of Dr. Chiaramonte's. Dr. Carlini appeared less than candid when he [testified] on the stand...." The Board argues, and we agree, that its job is to resolve credibility conflicts. "[A]bsent exceptional circumstances, the ALJ's credibility findings 'when adopted by the Board are to be accepted by the [reviewing] court.' " NLRB v. Air Products and Chemicals, Inc., 717 F.2d 141, 145 (4th Cir.1983) (citations omitted). The Hospital has pointed to no exceptional circumstances that necessitate setting aside the Board's credibility determinations
 
 
 [4]
 J.A. at 126-27. The Board credited this testimony because it found the witness to be honest and forthcoming. The nurse's testimony in contradiction was discredited by the Board, since it found that "[b]y her demeanor on the stand, Eicher impressed me most unfavorably as a witness. Like [the personnel director], she appeared willing to fabricate any testimony that might help the Hospital's cause." Id. at 25
 
 
 [5]
 In reaching its conclusion that the Hospital's action was discriminatory, the Board dismissed the allegation by the Hospital that its staff was full and had no room for Thomas. Upon reviewing the evidence submitted by the Hospital, we are satisfied the record supports the Board's conclusion. The Hospital argues that its budget for the OR shows a certain allotment of full-time positions, that this level was reached prior to Thomas' request, and that as a result its response to Thomas was legitimate. Though it may be true that the budgeted amount was reached, the Board rightfully discounted this fact since the Board found the Hospital routinely operated above its budgeted limit. (When asked why the July staffing levels exceeded the budget, the personnel director said that the Hospital, as a trauma center, had to keep the ORs going. He also admitted that the Hospital was above its staffing level throughout the year.) Thus, the Hospital's argument fails
 
 
 [6]
 The Board found that "[b]y his demeanor on the stand, Nieves appeared willing to fabricate any testimony that might help the Hospital's cause." J.A. at 12. For the reasons discussed in note 3, supra, we could accept the Board's credibility determination, but we need not go that far