NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

AIR PRODUCTS AND CHEMICALS,
INC., Respondent,

Teamsters, Chauffeurs, & Helpers Local
Union No. 391, Intervenor.

No. 83–1019.

United States Court of Appeals,
Fourth Circuit.

Argued July 14, 1983.

Decided Sept. 15, 1983.

Rehearing and Rehearing En Banc
Denied Nov. 14, 1983.

1980) (conduct of FEMA cannot waive requirement of filing of proof of loss.)

Michael J. Ossip, Philadelphia, Pa. (Harry Reagan, Morgan, Lewis & Bockius, Philadelphia, Pa., on brief), for respondent.

Janette Johnson, Washington, D.C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Elinor Hadley Stillman, Washington, D.C., on brief), for petitioner.

Jonathan G. Axelrod, Washington, D.C. (Beins, Axelrod & Osborne, P.C., Washington, D.C., on brief), for intervenors.

Before PHILLIPS, SPROUSE and ERVIN, Circuit Judges.

ERVIN, Circuit Judge:

This is a petition by the National Labor Relations Board ("NLRB") for enforcement

of its bargaining order issued against Air Products and Chemicals, Inc. ("Employer"). The NLRB held that Employer had engaged in substantial unfair labor practices in connection with the September 16, 1980 union election at Employer's Reidsville, North Carolina plant, thereby creating a situation where the possibilities of erasing the effects of the past unfair practices and of ensuring a fair future election by the use of traditional remedies were slight. Since the pro-union sentiment, once expressed by 13 of 24 employees through signed union cards, was considered a reliable basis for determining union majority status, the NLRB issued the order under *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). We grant enforcement of that order.

## I.

Employer is a Delaware corporation with plants located throughout the country. This petition stems from a union representation election held September 16, 1980 at Employer's Reidsville plant. In that election, the employees rejected Chauffeurs, Teamsters and Helpers Local Union No. 391 (the "Union") as its bargaining representative by a vote of 16 to 8. The Union subsequently filed charges of unfair labor practices by Employer during the election campaign. On July 27–28, 1981, a hearing on the charges was held before an NLRB administrative law judge.

The key testimony at the hearing was provided by Roger Haney, an employee. Half of the unfair labor practices found by the ALJ are premised solely on Haney's testimony and proof of the other half depends heavily upon his testimony as corroborating evidence. The ALJ explained his crediting of Haney's testimony as follows:

> Haney was clearly an individual who, as will be seen below, attempted to play both ends against the middle with respect to both the earlier Union campaign and the subsequent campaign which is the subject of this hearing. In demeanor he was not greatly impressive and portions of his testimony were vague, confusing,

and occasionally contradictory. As already indicated, his recollections with respect to the timing of certain events was not reliable. Based on the substance of Haney's testimony and from his demeanor, I am convinced that he is an individual who is motivated by extreme self-interest. Yet it is this extreme self-interest which enhances his credibility, for Haney's testimony herein was clearly against his self-interest. Since he remained an employee of the Respondent at the time of his testimony he was subject to possible economic retaliation. See *Victor Wukits d/b/a Vic's Shop 'N Save,* 215 NLRB 28 (1974); *Georgia Rug Mill,* 131 NLRB 1304, 1305 (1961), *modified on other grounds,* 308 F.2d 89 (5th Cir.1962). I would thus credit Haney's testimony where not specifically contradicted by more persuasive direct, circumstantial, or testimonial evidence.

The Reidsville plant opened on February 1, 1978. Shortly thereafter, an attempt was made to organize Employer's employees, but the effort was unsuccessful. No union election petition was filed and no allegations of unfair labor practices in connection with the failed effort were made.

A second union organizing campaign was initiated in January, 1979. During the campaign, Haney was called into the plant manager's office and asked, in reference to the Union's petition for recognition, "what is this in-plant organizing?" After Haney described the Union's organizing efforts, Employer's industrial relations manager responded:

> [W]e're not going to recognize anything on this. It's asking for recognition. I'm not going to write him [R.W. Brown, the Union Representative] back a letter or anything . . . . We're going to sit down. We're going to wipe the slate clean and negotiate from scratch, benefits and all. . . . You'll become my adversary and I'll fight you tooth and nail.

After some further discussion, Haney suggested that maybe he should "withdraw this thing," after which he agreed to circulate among other employees an Employer-

prepared counter-petition against the Union. The counter-petition then was forwarded to the Union and the NLRB, and the union petition was withdrawn. Later, Haney was told that if the union petition had not been withdrawn, Employer would have closed the plant, fired everyone, and then re-opened after three or four months with a new crew.

The Union did not claim any unfair labor practices by Employer in connection with the second campaign. Nevertheless, the ALJ found that "such conduct clearly demonstrates the Respondent's extreme hostility toward union organization of its employees."

By letter dated July 3, 1980, union organizer Brown informed Employer that a third campaign was underway. Between July 4 and July 21, the Union obtained union authorization cards from 13 of Employer's 24 employees. On July 17, the Union filed a petition for election with the NLRB. Several employees, however, prepared and circulated a counter-petition, dated July 28, 1980, that indicated that they did not wish to be represented by the Union. The petition was signed by 19 of the 24 employees. Two signers testified that they signed the petition only to "take some pressure off the employees."

The ALJ found 16 occasions during the third campaign on which Employer engaged in unfair labor practices in violation of § 8(a)(1) of the National Labor Relations Act, as amended (the "Act").

(1) On July 7, 8, or 9, Haney approached Employer's regional personnel manager Miffleton with information about the union campaign, at which time Miffleton violated the Act by questioning Haney about union activities and how many union cards had been signed. Since the violation occurred before the filing of the petition for election, the ALJ did not consider it as a basis for objection to the election.

(2) On July 22, 23, or 24, Miffleton and Haney again conversed, and Miffleton violated § 8(a)(1) by threatening (1) a plant closing because of union activities, (2) to discharge employee Wilson who was the principal union advocate, and (3) a lengthy strike if the Union were selected.

(3) In mid-July, terminal manager Lake violated the Act by interrogating Haney about his union involvement and threatening a plant shutdown:

> You're not involved in that are you Roger? ... No ... union is going to come in here and intimidate me or the company. I've worked unions and strikes before. Truck drivers are a dime a dozen, a bunch of nobodies and they can do what I say or they can hit the gate .... We'll shut this plant down and we'll get the liquid from other plants.

(4) Sometime in mid-July, supervisor Blair and Haney conversed and Blair said he had better receive 6 no-votes (i.e., anti-union) in the election. The ALJ concluded that Blair thereby threatened employees with unspecified reprisals because of their union activities in violation of § 8(a)(1).

(5) In early September, Blair commented to Haney that a $9 per hour wage rate shown in a union pamphlet could only be obtained through a strike. The ALJ found the comment coercive and violative of § 8(a)(1).

(6) A couple days before the election, Haney had a conversation with Blair and Miffleton in Blair's office. During the conversation, Miffleton indicated that the Reidsville plant would be phased out if the Union came in, just as had happened at the Employer's New Orleans plant. The threat was found violative of § 8(a)(1).

(7) In early September, Haney asked Blair what kind of pay raise the employees would get that year. Blair responded, "You guys vote this thing down and I will recommend all I can get for you. If you vote the union in, you'll vote to negotiate and strike for what you get." The ALJ found that Blair unlawfully promised Haney a wage increase if the Union were rejected.

(8) In December, after the election, Haney and Miffleton had a discussion during which Miffleton indicated that Employer could fight the Union in court "for three or

four years if we want to." The ALJ found the threat violative of the Act.

(9) In late July, Miffleton asked employee Wilson, the principal union organizer, whether employees Dyson and Dixon would stick with the Union. The question was found to be unlawful interrogation regarding union activities.

(10) On September 12, Miffleton told Wilson that the Union probably would have to strike and engage in lengthy negotiations with Employer. The threats were found violative of § 8(a)(1).

(11) After the election, supervisor Golden asked Wilson what he had been trying to prove and warned him that he had better watch his step. The remarks were held to be unlawful interrogation concerning union activities and a threat of more onerous working conditions.

(12) On August 17, Miffleton violated the Act by questioning employee Shaw about union activities and threatening a plant closure.

(13) In early July, supervisor Lake told truck driver Alexander that he had heard Alexander was pro-union. The statement was found to be an unlawful interrogation because it put Alexander in the position of having to admit or deny union involvement.

(14) On the day before the election, Miffleton unlawfully solicited Alexander to dissuade other employees from supporting the Union and threatened that the election of the Union would be futile.

(15) After the election, supervisor Gunter was asked by Alexander whether there would be any reprisals, and Gunter responded that Wilson would be "gone the first time he messed up." The comment was an unlawful threat of discharge because of union activity.

(16) In early September, Lake and Miffleton spoke with employee Dixon and threatened that the selection of the Union would be futile, solicited Dixon to dissuade other employees from voting for the Union, threatened plant closure, and created the impression of surveillance of union activities, all in violation of the Act.

Based on these violations, the ALJ found that the issuance of a bargaining order was appropriate under situation 2 of *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969): pervasive unfair labor practices were so serious that the possibility of erasing the effects of such practices by the use of traditional remedies so that a fair rerun election could be held was slight and the pro-union sentiment, once expressed by the 13 of 24 employees who signed union cards, was a reliable basis for determining union majority status. In so doing, the ALJ found that the anti-union petition dated July 28 and signed by 19 of 24 employees was caused by Employer's unfair labor practices and thus did not serve to invalidate the previous 13 of 24 union card majority.

On August 12, 1982, the NLRB affirmed the ALJ's decision and adopted his recommended order. *Air Products & Chemicals, Inc.*, 263 NLRB No. 45 (1982). On January 10, 1983, the NLRB filed this application for enforcement of the bargaining order.

## II.

■ It is well settled that absent exceptional circumstances, the ALJ's credibility findings, "when adopted by the Board are to be accepted by the [reviewing] court." *Dubin-Haskell Lining Corp. v. NLRB*, 375 F.2d 568, 571 (4th Cir.), *cert. denied*, 393 U.S. 824, 89 S.Ct. 83, 21 L.Ed.2d 95 (1967). One such exceptional circumstance is when the ALJ's credibility determination rests solely on employee status. In *L.S. Ayres & Co. v. NLRB*, 551 F.2d 586, 588 (4th Cir. 1977), this court stated that employee status is "only a factor bearing upon . . . credibility and . . . [a]n overall determination of credibility should not be predicated on the fact of employee status alone."

■ Employer argues that the ALJ relied solely on Haney's employee status in crediting his testimony. The ALJ also relied on the absence of direct denials by Employer's witnesses, the demeanor of the witnesses, and the situation surrounding the election campaign. Furthermore, other

employees testified concerning similar statements made to them, thus corroborating Haney's testimony. It is also significant that the ALJ discredited portions of Haney's testimony when the circumstances indicated that it was inaccurate; if the ALJ had been relying solely on employee status he necessarily would have accepted as true all of Haney's testimony. Finally, the ALJ's candid assessment of Haney indicates that the ALJ did not blindly accept Haney's testimony, but rather closely scrutinized it out of fear that it was distorted by Haney's "extreme self-interest."

### III.

Employer raises three challenges to the issuance of the bargaining order under situation 2 of *Gissel:* (1) the Union did not have a prior majority status; (2) the NLRB did not advance specific, detailed reasons supporting the order; and (3) there was no need for a bargaining order here. The challenges are without merit.

### A.

In order for a bargaining order to issue under *Gissel* situation 2, the Union must establish that it enjoyed majority status among the employees, which is generally proven by showing a pre-violation union card majority. Here, Employer argues that the original union card majority was effectively revoked by the July 28 anti-union petition. Employer claims that the ALJ incorrectly found that the counter-petition was tainted by Employer's unfair labor practices because (1) only three employees, Haney, Wilson, and Alexander, alleged pre-July 28 misconduct by the Employer, (2) Wilson and Alexander did not sign the petition, and (3) there is no evidence of dissemination of Employer's threats.

The flaw in Employer's argument is the premise that the Union must prove dissemination of the threats. There is no such requirement. The assumption is that employer threats, especially threats of plant closure, are rapidly disseminated among the employee group. *See J.C. Penny Co., Inc. v. NLRB,* 384 F.2d 479, 485 (10th Cir.1967); *Irving Air Chute Co. v. NLRB,* 350 F.2d 176, 179 (2d Cir.1965). Thus, this case is like *NLRB v. Quality Markets, Inc.,* 387 F.2d 20 (3d Cir.1967), where the revocation of a previous pro-union card majority was discounted because it occurred after the employer's unfair labor practices began.[1] *See Medo Photo Supply Corp. v. NLRB,* 321 U.S. 678, 687, 64 S.Ct. 830, 834, 88 L.Ed. 1007 (1944) (employer "cannot, as justification for its refusal to bargain with the union, set up the defection of union members which it had induced by unfair labor practices"). Notably, in *Quality Markets,* an employee's card revocation was discounted even though she was not the immediate target of the unfair practices because dissemination was assumed, that is, she "could not have been unaware of the Company's conduct and attitude." *Id.* at 23.

### B.

The NLRB must advance specific, detailed reasons supporting the issuance of a *Gissel* bargaining order. *NLRB v. Appletree Chevrolet, Inc.,* 608 F.2d 988 (4th Cir. 1979). Here, the NLRB justified the order on grounds that (1) Employer's conduct during the earlier campaign established its "hostility to employee union activity" and "proclivity for interference," (2) the quality of the unfair labor practices, especially the threats of plant closure, was severe, (3) the size of the unit was small and the Employer's coercive conduct was directed at a significant percentage, 20%, of that unit, (4) the unfair practices were extensive, beginning soon after Employer learned of the campaign and extending until after the election, and (5) the large number of Employer's managers who participated in the violations. That explanation clearly satisfies the specificity requirement.

---

1. Employer's reliance on *Struthers-Dunn, Inc. v. NLRB,* 574 F.2d 796 (3d Cir.1978) is misplaced. In that case, the revocation of the pro-union majority occurred *before* the employer engaged in any unfair labor practices. Here, the revocation occurred *after* the initiation of unfair labor practices.

## C.

While "an election, not a bargaining order, remains the traditional, as well as the preferred, method for determining the bargaining agent," *Appletree,* 608 F.2d at 996, it is "for the Board and not the courts . . ., based on its expert estimate as to the effects on the election process of unfair labor practices of varying intensity," to determine the necessity for a bargaining order, *Gissel,* 395 U.S. at 612 n. 32, 89 S.Ct. at 1939 n. 32. Employer nevertheless argues that the NLRB abused its discretion in issuing the bargaining order. The NLRB's justifications for issuing the order, however, all have been cited by this court and others as supporting a bargaining order. The small bargaining unit and substantial percentage of employees affected, the serious nature of the threats, the extended period over which the violations occurred, the large number of managers guilty of violations, and the history of anti-union animus at the Reidsville plant justify the NLRB's exercise of its discretion to issue the order. *See, e.g., Standard-Coosa-Thatcher Carpet Yarn Division, Inc. v. NLRB,* 691 F.2d 1133 (4th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 1772, 76 L.Ed.2d 345 (1983); *Chromalloy Mining and Minerals Alaska Div. v. NLRB,* 620 F.2d 1120 (5th Cir.1980); *NLRB v. Kane,* 435 F.2d 1203 (4th Cir.1970).

## IV.

For the foregoing reasons, the petition for enforcement is granted.

ENFORCEMENT GRANTED.