**SOMERSET WELDING & STEEL, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 91–1441.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 16, 1992.

Decided Jan. 22, 1993.

As Amended Jan. 22, 1993.

As Amended on Petition for Rehearing March 4, 1993.

Concurring Opinion of Judge Edwards on Petition for Rehearing April 2, 1993.

Rehearing Denied March 22, 1993.

Richard Steyer, Washington, DC, for petitioner. William H. Howe, Washington, DC, also entered an appearance.

Robert J. Englehart, Atty., N.L.R.B., with whom Jerry M. Hunter, Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, and Collis Suzanne Stocking, Atty., N.L.R.B., Washington, DC, were on the brief, for respondent. Paul J. Spielberg and Frederick C. Havard, Attys., N.L.R.B., Washington, DC, also entered appearances for respondent.

Before EDWARDS, WILLIAMS and HENDERSON, Circuit Judges.

Opinion for the court filed by Circuit Judge KAREN LeCRAFT HENDERSON.

Concurring opinion filed by Circuit Judge HARRY T. EDWARDS.

KAREN LeCRAFT HENDERSON, Circuit Judge:

The National Labor Relations Board (Board) decided that Somerset Welding & Steel, Inc. (Company) had violated sections 8(a)(1) and (a)(3) of the National Labor Relations Act (Act) and ordered the Company to recognize and bargain with the United Steelworkers of America, AFL–CIO–CLC (Union) on request. The Company challenges the Board's conclusions as well as its remedy, arguing that (1) the Board's findings that a valid card majority existed and that statements by various supervisors violated sections 8(a)(1) and (a)(3) of the Act were not supported by substantial evidence, (2) even if the statements violated sections 8(a)(1) and (a)(3), they did not warrant the issuance of a bargaining order and (3) changes in management and employee turnover have made a bargaining order unnecessary. The Board cross-petitions seeking enforcement of its order. Because the Board failed to explain adequately why certain incidents violated the Act and "why traditional remedies could not reasonably

ensure a fair election," *Avecor, Inc. v. NLRB*, 931 F.2d 924, 939 (D.C.Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 912, 116 L.Ed.2d 812 (1992), we remand this case to the Board for reconsideration of the bargaining order remedy.

## I.

On March 17, 1987, the Union filed an election petition with the Board. The Company refused to recognize the Union and allegedly began a campaign of intimidation and reprisals to encourage its employees to vote against the Union. When the election was held, the Union lost by a 71–64 vote. It then petitioned the Board claiming unfair labor practices. The Administrative Law Judge (ALJ) heard conflicting testimony, concluded that various violations had taken place and recommended that the Board issue a *Gissel*[1] bargaining order. The Company filed exceptions and the Board, after reviewing the record, affirmed the ALJ's findings and recommended order except as modified.

Specifically, the Board found that Guy Rush, the Company's vice president in charge of production, repeatedly contacted employees in an effort to uncover which employees were involved in the union movement and whether the Union could be stopped. In addition, Rush implied that some of the Company's facilities might be closed if the employees unionized. According to the Board, John Tims Sr., superintendent of one of the facilities, called his son, a Company employee, two nights before the election to find out how he planned to vote. During the conversation, Tims Sr. allegedly commented that, if the Union won, the plant where Tims Jr. worked would close or the employees would lose their benefits. Tims Sr. also threatened to fire his son if he voted for the Union. Dwight Clyde, plant manager of one of the facilities, also allegedly warned several employees of plant closures if unionization

---

[1]. *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). According to *Gissel,* there are two categories of bargaining orders: those issued in "exceptional cases marked by outrageous and pervasive unfair labor practices" (category I) and those issued in

"less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election process" (category II). *Id.* at 613–14, 89 S.Ct. at 1940. Here, the Board issued a category II *Gissel* bargaining order.

occurred. On one occasion, Clyde implied, by showing that unionization would make one of the plants unprofitable, that plant closures would occur with unionization.[2] Roger Pyle, a first-line supervisor, told two employees that Company Chairman Sidney Riggs would close their plant if the Union won. Rod Berkley, another first-line supervisor, allegedly opined to at least three employees that, if the Union won, the Company would move or firings and zero-based bargaining likely would occur. Finally, the Company allegedly denied employee Thomas Deist a promised pay increase after he attended a Union meeting.

Additionally, the ALJ found that certain actions of Chairman Riggs violated section 8(a)(1). At four meetings employees were required to attend, Riggs gave a presentation about the state of the industry. He identified plants of other companies that had unionized and then closed. He also expressed concern about union-led shutdowns at other plants. Allegedly, he threatened to adopt a strategy of zero-based bargaining[3] and commented that unionization would not increase employee benefits because the Company could not afford to spend more. The ALJ concluded that these actions were illegal and that "low level supervisors were largely inspired by the illicit conduct of Sidney Riggs." ALJ Op. at 47. The Board did not decide, however, whether Riggs's conduct was illegal and did not use it as a basis to affirm the ALJ's order.

## II.

■ We recognize that our scope of review is limited. The Board's findings of fact are conclusive if supported by substantial evidence and we must give "substantial deference to inferences drawn from the facts [and] to choices of remedies." *Avecor, Inc.*, 931 F.2d at 928 (citations omitted). Nevertheless, we do not automatical-

ly enforce a bargaining order: indeed, "[w]here a fair rerun election is possible, it must be held." *Id.* at 934. To enforce a *Gissel* category II bargaining order, three findings must be supported by substantial evidence.

First, the Union, at some time, must have had majority support within the bargaining unit. Second, the employer's unfair labor practices must have had the tendency to undermine majority strength and impede the election process. Finally, the Board must determine that the possibility of erasing the effects of past practices and of ensuring a fair rerun election by use of traditional remedies is slight and that employee sentiment once expressed in favor of the Union would be better protected by a bargaining order.

*St. Francis Fed'n of Nurses & Health Professionals v. NLRB*, 729 F.2d 844, 854–55 (D.C.Cir.1984). "The third finding, in addition, must be supported by a reasoned explanation that addresses several subissues." *Avecor, Inc.*, 931 F.2d at 934–35. Here, we believe that the first and second findings are sufficiently supported but the third is not supported by adequate findings and reasoned decisionmaking.

■ First, we agree with the Board that the Union obtained a valid card majority. The Company claims that the Union never had a valid card majority to call for an election because Cary Mishler, who acted as a supervisor on occasion, solicited eight cards and because Brad Barclay, who solicited three cards, told the signers that the cards would have no effect beyond merely triggering an election.[4] Both actions, if they happened, are improper. However, we reject both claims. The eight cards Mishler solicited were properly authenticated and the evidence indicated that Mishler was no more than a sporadic assistant supervisor and therefore not a management representative (or "acting for manage-

---

2. The ALJ concluded that information about the profitability of one plant, even if accurate, was too narrow to apply to the profitability of the Company and therefore sent the incorrect message that the employees "could not have their jobs and a wage increase too." ALJ Op. at 20.

3. Zero-based bargaining means that all existing employee benefits are put back on the bargaining table, beginning the negotiating process from "scratch" or "zero."

4. By signing the card, an employee in fact agreed to the Union as his representative.

ment"). Although it is unclear what Barclay told people when he solicited cards, the cards unambiguously designated the Union as the employees' representative and were therefore valid. *See Levi Strauss & Co.,* 172 N.L.R.B. 732, 733 (1968), *enforced,* 441 F.2d 1027 (D.C.Cir.1970).

■ On the other hand, we cannot determine whether certain of the supervisors' statements violated the Act and therefore whether they "undermine[d] majority strength and impede[d] the election process." *Avecor, Inc.,* 931 F.2d at 934. For example, after a mandatory meeting, Dwight Clyde showed some employees a profit sheet indicating that the construction of three completed trailers generated only a slight profit margin. He added that, with any wage increases, "there'd be no way that the shop could continue to go." ALJ Op. at 19. In *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969), the Supreme Court declared that to be permitted under the Act, "[a] prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control...." Clyde's comments seem to us to satisfy *Gissel.* The ALJ concluded otherwise: "Clyde had every right to demonstrate the slight profit margins involved in producing these *three* trailers, but that evidence was too isolated to privilege [sic] any comment suggesting that the trailer plant would close in the event of wage increases." ALJ Op. at 19–20 (emphasis in original). The Seventh Circuit has commented that, with respect to the restaurant industry:

> we do not read *Gissel* to require the employer to develop detailed advance substantiation in the manner of the Federal Trade Commission, at least for predictions founded on common sense and general experience. A small company in the restaurant business should not have to hire a high-powered consultant to make an econometric forecast of the

probable consequences of unionization on the restaurant business in Decatur.

*NLRB v. Village IX, Inc.,* 723 F.2d 1360, 1368 (7th Cir.1983) (citation omitted). The same reasoning applies here. A small manufacturer is competent to recognize that if a plant is barely turning a profit on its product, any wage increase threatens its profitability and ultimately its survivability. We leave to the Board to decide whether Clyde's profitability remark violated the Act.

■ Notwithstanding that the statements of Rush, Pyle and Berkley and certain of Clyde's statements violated the Act, the Board did not explain why they were so pervasive that "the possibility of erasing the effects of past practices and of ensuring a fair rerun election by the use of traditional remedies is slight....," *St. Francis Fed'n of Nurses & Health Professionals,* 729 F.2d at 854, and therefore failed to support the third finding required under the *St. Francis* test. The Board merely stated that threats of plant closures are "hallmark" violations and that they were "sufficiently pervasive" so that "it is unlikely that our usual remedies will erase their effects." Bd. Op. at 7 & n. 7. It added that they "are likely to have a lasting impact which is not easily erased by the mere passage of time or the Board's usual remedies." Bd. Op. at 7. The Board's conclusion is undercut by two factors. First, as the Company argues, only a handful of employees—fewer than ten per cent [5]—heard the supervisors' statements. Pet. Br. at 23. To rebut this contention, the Board responds that "this is not an insignificant portion of the workforce," Resp. Br. at 42, and relies on a case in which the coercive conduct affected *twenty* per cent of the bargaining unit. *See NLRB v. Air Prods. & Chems., Inc.,* 717 F.2d 141, 146 (4th Cir.1983). Here there is no evidence that any employees other than the twelve earlier noted knew about the statements.

A second, and more important, reason the third required finding has not been

---

5. Although the record does not provide an exact number, the Company alleges that approximately a dozen of the 142 unit employees heard the statements. Pet. Br. at 23. The Board does not challenge this number. Resp. Br. at 42.

satisfied is that the Board did not rely on Chairman Riggs's violations, violations the ALJ had considered "[c]entral to the *Gissel* issue." ALJ Op. at 46. The ALJ viewed the supervisors' coercive remarks as "no more than a simplification of the arguments communicated to the entire work force on several occasions by Sidney Riggs." *Id.* In addition, the ALJ noted that "the illicit references to a curtailment of jobs and employment opportunities would have indelible meaning to anyone with employment ties to this region." *Id.* at 47. The entire section of the ALJ's opinion entitled "The Propriety of a Bargaining Order" focuses on Riggs's conduct with only passing reference to the supervisors' conduct. But the Board concluded that it was "unnecessary to decide whether Riggs' [sic] conduct violated Section 8(a)(1) of the Act." The Board may have avoided the issue because it determined that Riggs's conduct did not violate the Act. *See Village IX, Inc.,* 723 F.2d at 1367–69. Without Riggs's conduct, however, there is not sufficient evidence that the effect of the supervisors' coercive threats was pervasive and the bargaining order therefore cannot be upheld.

A third reason that the required finding has not been satisfied is that the Board did not adequately consider changes in management and employee turnover at the Company since the time of the election. In denying the Company's motion to reconsider the bargaining order, the Board briefly discussed the issue in a footnote. Mot. for Recons. at 2 n. 3. It stated that "the validity of a bargaining order depends on an evaluation of the situation as of the time the unfair labor practices were committed." *Highland Plastics,* 256 N.L.R.B. 146, 147 (1981). This statement is inaccurate in the context of employee turnover. We have held that "before issuing a category II bargaining order, the Board *must carefully* consider employee turnover." *Avecor, Inc.,* 931 F.2d at 937 (emphasis added). In addition, "it must examine turnover that has occurred up to the time it would issue the new order." *Id.* We have imposed this requirement because "[w]here many of the intimidated employees have moved on, and

where the company is under order not to resume its unlawful ways, a fair election may well be possible." *Id.* at 936.

The Board concluded that employee turnover occurring since the election was insufficient to affect the appropriateness of the bargaining order because 50 of the current 64 employees, or 78 per cent, worked at the Company at the time of the election. We do not know, however, how many of the 50 employees signed the cards authorizing an election. Furthermore, two of the supervisors accused of making coercive threats, Clyde and Berkley, no longer serve as supervisors. These changed conditions warrant close examination of the bargaining order to determine if it is required.

Finally, we cannot enforce the bargaining order remedy because no reasoned justification therefor appears in the Board's order. In *Peoples Gas Sys., Inc. v. NLRB,* 629 F.2d 35, 46 (D.C.Cir.1980), we stated that

> before we will enforce a bargaining order, we must be able to determine from the Board's opinion (1) that it gave due consideration to the employees' section 7 rights, which are, after all, one of the fundamental purposes of the Act, (2) why it concluded that other purposes must override the rights of the employees to choose their bargaining representatives and (3) why other remedies, less destructive to employees' rights, are not adequate.

Here, none of the three factors was adequately addressed. The ALJ stated in passing that the authorization cards furnish "a more reliable indicia of employee choice than might be possible through a future election held under protection of conventional remedies." ALJ Op. at 47. But he did not further explain his conclusion. In *Avecor, Inc.,* we insisted that the ALJ or the Board explain why the violations were likely to linger. There we looked for evidence that management would resume anti-union practices. *Avecor, Inc.,* 931 F.2d at 938. We criticized the ALJ for offering only "conclusory statements that a fair rerun election cannot be held." *Id.* (quoting *St. Agnes Medical*

*Ctr. v. NLRB*, 871 F.2d 137, 148 (D.C.Cir. 1989)). In view of the Board's failure to support the bargaining order remedy, we remand to the Board to consider further whether a bargaining order is required.

### III.

We have already noted the Board's apparent partiality for bargaining orders. *Id.* As one of our colleagues remarked, if the Board has adopted a policy of issuing bargaining orders "whether or not it is reasonable to believe a fair election could be held.... it should forthrightly acknowledge what it is doing, and not pretend that it is closely examining cases to evaluate current prospects for an election untainted by past unlawful practices." *St. Francis Fed'n of Nurses & Health Professionals*, 729 F.2d at 861–62 (Ginsburg, Ruth B., J., dissenting) (citations omitted). Because the Board has failed to explain its reasoning, we remand to address three specific issues: (1) whether Chairman Riggs's statements violated the Act, and, if so, whether his violations are needed to support a remedial bargaining order; (2) whether the statements of Tims Sr., about plant closures and Clyde's profitability remark violated the Act, and, if so, why their statements, along with those of Rush, Pyle and Berkley, as well as Clyde's other statements, were so pervasive as to warrant a remedial bargaining order; and (3) whether, assuming a bargaining order is otherwise warranted, changes in management and employee turnover have made a bargaining order unnecessary.[6]

*It is so ordered.*

HARRY T. EDWARDS, Circuit Judge, concurring in the judgment:

This case must be remanded for further consideration, because the Board has thus far failed to justify a bargaining order remedy with the specific findings required by *Avecor, Inc. v. NLRB*, 931 F.2d 924, 934

---

**6.** Our remand does not disturb the portions of the Board's order finding violations of section 8(a)(1) insofar as they relate to statements by Rush, Pyle, Berkley and Clyde (other than Clyde's profitability remark) nor does it disturb

---

(D.C.Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 912, 116 L.Ed.2d 812 (1992). On remand, the Board must specifically address three issues: (1) whether Chairman Riggs' statements violated the Act, and, if so, whether these violations support a remedial bargaining order; (2) why statements about possible plant closure made by supervisors Rush, Tims, Sr., Clyde, Pyle, and Berkley violated the Act, and, if they did, why these statements were sufficiently pervasive to justify a remedial bargaining order; and (3) whether the changes in management and employee turnover that have occurred since the occurrence of the violations have made a bargaining order unnecessary.

I concur only in the judgment of the court remanding this case for further consideration.

### ON RESPONDENT'S PETITION FOR REHEARING

[Filed April 2, 1993]

EDWARDS, Circuit Judge, concurring in the judgment:

On March 4, 1993, an Order amending the majority opinion was issued pursuant to Respondent's Petition for Rehearing. That Order reads as follows:

> It is ORDERED by the court that the opinion filed by the court on January 22, 1993, be amended as follows: ■
>
> Page 5, line 12, strike "finding is sufficiently supported, the second *may* be sufficiently supported and". Insert the following: "and second findings are sufficiently supported but".
>
> Page 5, line –3, after the word "whether" insert "certain of".
>
> Page 6, line –5, strike "We do not believe that Clyde's profitability remark violated the Act." Insert the following: "We leave to the Board to decide whether Clyde's profitability remark violated the Act."

the Board's order that Thomas Deist be made whole for "earnings lost."

Page 6, line –2, strike "Even assuming without concluding that all of management's statements, including the statements of Rush, Tims Sr., Pyle and Berkley described earlier". Insert the following: "Notwithstanding that the statements of Rush, Pyle and Berkley and certain of Clyde's statements".

Page 6, strike footnote 5. Renumber subsequent footnotes.

Page 10, line –6, strike "whether the statements of Rush, Tims Sr., Pyle, Clyde and Berkley about plant closures (other than Clyde's profitability remark) violated the Act, and, if so, why they were so pervasive as to warrant a remedial bargaining order;". Insert the following: "whether the statements of Tims Sr. about plant closures and Clyde's profitability remark violated the Act, and, if so, why their statements, along with those of Rush, Pyle and Berkley, as well as Clyde's other statements, were so pervasive as to warrant a remedial bargaining order;".

Page 10, strike footnote 7. Insert as new footnote 6 the following: "Our remand does not disturb the portions of the Board's order finding violations of section 8(a)(1) insofar as they relate to statements by Rush, Pyle, Berkley and Clyde (other than Clyde's profitability remark) nor does it disturb the Board's order that Thomas Deist be made whole for "earnings lost."

I continue to concur only in the judgment of the court remanding this case for reconsideration. I have revised my previous concurrence in light of the two objections raised by the Board in its Petition for Rehearing and Suggestion for Rehearing En Banc. One of the Board's objections has merit; the other does not.

The Board has correctly pointed out that its findings of section 8(a)(1) violations with respect to supervisors Rush, Pyle, Berkley, and some of the statements of supervisor Clyde, were not at issue on appeal. The majority opinion has been modified accordingly. The Board is in error, however, in claiming that the panel majority's original opinion ordered the Board, on remand, "to inquire how many of the current employees, who also were employed at the time of the election, signed union-authorization cards." Petition for Rehearing at 5. This claim reflects a misreading of the majority opinion, which simply observes that "[w]e do not know ... how many of the 50 employees signed the cards authorizing an election." Nothing in the opinion suggests that the Board is *required* to make such a finding on remand, or that such a finding is dispositive of the bargaining order issue. Thus, our original holding is largely unchanged, except that we no longer remand the statements of supervisors Rush, Pyle, Berkley, and the uncontested statements of supervisor Clyde, for reconsideration by the Board.

The reason for the court's remand is that the bargaining order remedy cannot stand on the present record, because the Board failed to make certain of the specific findings required by *Avecor, Inc. v. NLRB*, 931 F.2d 924, 934 (D.C.Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 912, 116 L.Ed.2d 812 (1992). In particular, the Board has failed to explain why " 'the possibility of erasing the effects of past practices and of ensuring a fair rerun election by the use of traditional remedies is slight and that employee sentiment once expressed in favor of the Union would be better protected by a bargaining order'." *Id.* (quoting *St. Francis Fed'n of Nurses & Health Professionals v. NLRB*, 729 F.2d 844, 854–55 (D.C.Cir.1984)). On remand, the Board must specifically address three issues: (1) whether Chairman Riggs' statements violated the Act, and, if so, whether these violations support a remedial bargaining order; (2) whether supervisor Tims, Sr.'s statement about plant closures violated the Act; whether supervisor Clyde's remark about plant profitability violated the act; and, if so, why these statements, along with the other illegal statements made by Rush, Pyle, Berkley and Clyde, were so pervasive as to warrant a remedial bargaining order; and (3) whether the changes in management and employee turnover that have occurred since the oc-

currence of the violations have made a bargaining order unnecessary.