**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS
### FOR THE FOURTH CIRCUIT

NATIONAL LABOR RELATIONS BOARD,
                        *Petitioner,*

v.                                                        No. 00-1120

MOUNTAINEER STEEL, INCORPORATED,
                        *Respondent.*

On Application for Enforcement of an Order of the
National Labor Relations Board.
(9-CA-34103-1, 9-CA-34103-2)

Argued: January 24, 2001

Decided: April 27, 2001

Before WILKINS and MICHAEL, Circuit Judges, and
Claude M. HILTON, Chief United States District Judge for
the Eastern District of Virginia, sitting by designation.

_____

Enforcement granted by unpublished per curiam opinion.

_____

### COUNSEL

**ARGUED:** Forrest Hansbury Roles, HEENAN, ALTHEN &
ROLES, Charleston, West Virginia, for Mountaineer Steel. Rachel
Irene Gartner, NATIONAL LABOR RELATIONS BOARD, Wash-
ington, D.C., for Board. **ON BRIEF:** Leonard R. Page, General
Counsel, Linda Sher, Associate General Counsel, Aileen A. Arm-
strong, Deputy Associate General Counsel, Peter Winkler, Supervi-
sory Attorney, NATIONAL LABOR RELATIONS BOARD,
Washington, D.C., for Board.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

PER CURIAM:

The National Labor Relations Board (the Board) petitions this court for enforcement of an order issued against Mountaineer Steel, Inc. The Board's decision affirmed an administrative law judge's ruling that Mountaineer Steel had violated certain provisions of the National Labor Relations Act (NLRA), 29 U.S.C. §§ 158(a)(1), (3). Because we conclude that the Board's decision is supported by substantial evidence and is correct as a matter of law, we grant the Board's petition for enforcement.

I.

Mountaineer Steel repairs and maintains coal mining equipment. The company's busiest time of year occurs during a six-week period each summer, which is known as miners' vacation. The company employs a variety of workers (machinists, welders, mechanics, etc.), and all decisions regarding hiring, firing, and layoffs are made by the company's president, Roy Stanley, with input from two foremen, Grover Chambers and Harry Chambers.

In 1995 Mountaineer Steel entered into a collective bargaining agreement (the 1995 Agreement) with the United Mine Workers of America, AFL-CIO, and the International Union, United Mine Workers of America, Local 1582, AFL-CIO (collectively, "the Union"). When the 1995 Agreement was signed, the Union did not represent a majority of Mountaineer Steel's employees. Because the Union did not represent a majority of employees, the Agreement was only enforced for a short period of time.

Early in the summer of 1996 one of Mountaineer Steel's employees, Lawrence Kammerer, learned of the 1995 Agreement and discussed the possibility of union representation with other employees.

One of the employees, Ronnie Williams, contacted the Union. On or before July 20, 1996, Jerry Kerns, Sr., a Union representative, went to Mountaineer Steel's work site and spoke to company employees about union representation. Kerns asked the employees at the work site if they "were aware that [they] were under a union contract." At the time Kerns made this statement, one of the foremen, Harry Chambers, was present.

Roy Stanley and Grover Chambers met on July 22 or 23 to discuss the need for a possible layoff. Earlier in the season the company had hired sixteen to eighteen new employees in anticipation of the increased work load during miners' vacation. Although many of the employees had been working substantial amounts of overtime, Stanley and Grover Chambers testified that they met on July 22 or 23 to discuss layoffs because they were concerned that there would not be enough work for all of the current employees.

Several days later, on July 29 or 30, Grover Chambers approached a group of employees who were discussing the Union and eating lunch in the company's shop area. Chambers singled out employee Williams and said, "I thought you was a union radical and now I know you are."

On July 31 the president of Local 1582, Jerry Kerns, Jr., and another Union representative, Jerry Kerns, Sr., met with sixteen to twenty Mountaineer Steel employees in a restaurant parking lot. The meeting's participants discussed the 1995 Agreement and the possibility of union representation. As several witnesses testified, the primary purpose of the meeting was to obtain union representation to improve working conditions. The employees wanted to know how they could join the Union, and the Union officials furnished checkoff/authorization cards to any employee who wanted to join the Union. The cards authorized the company to deduct dues from the employees' wages and also authorized the Union to act as the employees' "representative in all matters concerning wages, hours, and other terms and conditions of employment." Sixteen employees signed the checkoff/authorization cards during the meeting. In addition, two employees present at the meeting took the cards with them and signed them on August 3.

On August 2, just two days after the meeting between the employees and Union representatives, employee Jeffrey Phillips had a conversation with foreman Grover Chambers. Chambers told Phillips that he had heard rumors that the employees were going to try to "vote the union in" and asked Phillips if he had attended the July 31 meeting. Phillips responded, saying that he had attended the meeting and that "plenty of people had signed the cards." Chambers, after indicating that he was surprised by some of the people who had reportedly signed cards, said: "if you people want to vote yourselves out of a damn job, go ahead, I can go back to Smithers (his former employer) any day of the week." That same day the company discharged six employees who had signed the Union checkoff/authorization cards. Company president Stanley told Williams, one of the employees who was discharged, that there would be six or seven additional employees laid off and "then if this stuff don't straighten up, there'll be some more Friday, this union stuff." The following day, on August 3, Stanley approached employees Phillips and Simpkins to discuss the layoff. Stanley said that the company was short on funds and that "he couldn't afford to pay union [wages]."

Sometime between July 31 and August 5 Mountaineer Steel's management staff made several threatening statements regarding employee support for the Union. Foreman Grover Chambers approached employee Kammerer and asked him if he knew how many people had signed the Union cards and said that "people who are organizers could be labeled as troublemakers." In addition, in early August foreman Harry Chambers told employees Lee Hancock and William Sergeant that anyone who signed a Union card would be laid off or terminated.

On August 5 the company discharged four additional employees, including Phillips, Simpkins, and Kammerer. All four of these men attended the July 31 meeting and signed authorization cards.

On August 8 Stanley and Mountaineer Steel's lawyer met with Union representatives to discuss the current relationship between the Union and the company. At the conclusion of the meeting, Union representative Jerry Kerns, Sr. pushed a stack of signed checkoff/authorization cards across the table in front of Stanley and said, "this is something I want you all to know about." Although Stanley

refused to take the cards, the company's lawyer picked up the cards and left the meeting with Stanley. Included in the stack of cards were ones signed by employees Stroud, Lambert, and Vance. Later in the day the company laid off Stroud. The company laid off Lambert on August 13 and Vance on August 19.

Upon charges filed by the Union, the Board's General Counsel issued a complaint against Mountaineer Steel on December 10, 1996, alleging several violations of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(a)(1), (3). After a hearing an ALJ determined that Mountaineer Steel had violated section 8(a)(1) of the NLRA by threatening employees with termination for union activities, by creating the impression of surveillance of the employees' union activities, and by coercively interrogating employees about employee participation in union activities. Moreover, the ALJ decided that the company's discriminatory termination of fourteen employees violated sections 8(a)(3) and 8(a)(1) of the Act. The ALJ issued a recommended order that would require Mountaineer Steel to cease and desist from violating the NLRA and to offer reinstatement to the men who were laid off. Mountaineer Steel appealed to the Board, which affirmed and adopted the ALJ's decision and recommended order on August 27, 1998. *See Mountaineer Steel, Inc.*, 326 N.L.R.B. 787, 1998 WL 614889 (Aug. 27, 1998). The Board now petitions this court for enforcement of its order.

"The scope of our inquiry in reviewing the Board is limited." *Medeco Sec. Locks, Inc. v. NLRB*, 142 F.3d 733, 742 (4th Cir. 1998). We defer to the Board's interpretations of the NLRA if they are "rational and consistent with the Act." *NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 787 (1990). Credibility determinations are left to the discretion of the Board absent "exceptional circumstances." *NLRB v. Air Prods. & Chem., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983). If the factual findings adopted by the Board are supported by substantial evidence in the record, the findings are "conclusive," 29 U.S.C. § 160(e), and we must uphold the Board's decision, *see Medeco*, 142 F.3d at 742. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Alpo Petfoods, Inc. v. NLRB*, 126 F.3d 246, 250 (4th Cir. 1997) (internal quotation marks and citations omitted). Thus, this court may not "displace the Board's choice between two fairly conflicting views, even

though the court would justifiably have made a different choice had the matter been before it de novo." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *see also Alpo*, 126 F.3d at 250 (holding that this court must uphold the NLRB's decision even though it "might have reached a different result had we heard the evidence in the first instance") (internal quotation marks and citation omitted).

Mountaineer Steel challenges the Board's decision on the ground that the ALJ's underlying findings are not supported by substantial evidence. Because we conclude that the findings are based on substantial evidence in the record, we grant enforcement of the Board's order.

## II.

Under section 7 of the NLRA, 29 U.S.C. § 157, employees have the right to "form, join, or assist labor organizations . . . and to engage in other concerted activities for the purpose of . . . mutual aid or protection." Section 8(a)(1) of the NLRA, 29 U.S.C. § 158(a)(1), makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of [Section 7] rights." To establish a violation under Section 8(a)(1), the General Counsel must demonstrate that under the circumstances an employer's conduct "had a reasonable tendency" to coerce or intimidate employees. *Standard-Coosa-Thatcher Carpet Yarn Div., Inc. v. NLRB*, 691 F.2d 1133, 1137 (4th Cir. 1982). The question of whether conduct is coercive is "essentially for the specialized expertise of the NLRB." *Daniel Constr. Co. v. NLRB*, 341 F.2d 805, 811 (4th Cir. 1965).

The Board adopted the ALJ's determination that Mountaineer Steel violated section 8(a)(1). The Board thus concluded that the company unlawfully threatened employees with termination, created the impression of surveillance, and coercively interrogated employees regarding employee union activity. On appeal the company challenges these conclusions on the ground that they are not supported by substantial evidence. Contrary to the company's assertions, the factual record supports the conclusions of the Board.

## A.

An employer violates section 8(a)(1) of the NLRA when it coercively interrogates its employees about their union activities or the

union activities of their fellow employees. *See NLRB v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145, 147 (4th Cir. 1983). The Board found that on at least two occasions, one of Mountaineer Steel's supervisors coercively interrogated employees. Employee Jeffery Phillips testified that he was questioned by Grover Chambers, one of the company's foremen, in the afternoon of August 2. James Simpkins, another employee, was present for portions of the conversation and corroborated Phillips's testimony. According to Phillips, Chambers asked Phillips whether he had attended the July 31 Union representative-employee meeting and whether he was "involved." Chambers then told Phillips, "if you people want to vote yourselves out of a damn job, go ahead, I can go back to Smithers (his former employer) any day of the week." In addition, employee Lawrence Kammerer testified that Chambers asked him whether he knew how many persons signed Union cards and said that employees who were organizers could be labeled as "troublemakers." Kammerer said that the conversation took place between July 31 and August 5.

Mountaineer Steel insists that Chambers could not have made the comments to Phillips because he was on vacation with his family. The company introduced the testimony of Chambers, his wife, and Stanley as well as Chambers's handwritten time cards to demonstrate that he was on vacation at Myrtle Beach from July 28 to August 2 and that he did not return until 7:00 p.m. on August 2. Thus, Mountaineer Steel asserts that the Board's conclusion that the company coercively interrogated its employees is not supported by substantial evidence.

We disagree. The ALJ found that the testimony of Chambers and his wife regarding their vacation was not credible. The ALJ discredited Grover Chambers's vacation defense for several reasons. First, several employees reported that Chambers was in the shop during the time (July 28 to August 2) he claims to have been away on vacation. For example, Ronnie Williams testified that on July 28 or 29 Chambers had called him a "union radical." Williams also said that Chambers had supervised him during the week of July 28. Second, Chambers claimed that he stayed in a hotel in Myrtle Beach, yet he produced no receipt or other record of his stay. Chambers also said that his new car "acted up" on the way to Myrtle Beach and that he returned the car to the dealer for repairs and then borrowed his brother's truck to complete the trip. Again, Chambers produced no record

to verify any car repairs. Because credibility determinations are left to the discretion of the trier of fact absent "exceptional circumstances," *NLRB v. Air Prods. & Chem., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983), the ALJ did not err when she rejected the company's claim that Chambers was on vacation and could not have made the statements attributed to him. Thus, the Board's determination that the company coercively interrogated employees is supported by substantial evidence.

### B.

An employer creates an impression of surveillance when an employee would reasonably assume from the employer's statements that his union activities had been placed under surveillance. *See NLRB v. Grand Canyon Mining Co.*, 116 F.3d 1039, 1046 (4th Cir. 1997). The Board determined that on two occasions, Mountaineer Steel created an impression of surveillance. First, Ronnie Williams testified that Grover Chambers approached him while he was discussing union activities with his co-employees and said, "I thought you was a union radical and now I know you are." The Board found that the statement, "I thought you was a union radical," indicated that Chambers had been monitoring Williams's conduct. Also, the statement, "and now I know you are," created an impression that Chambers had been watching Williams's activities. Second, the Board found that Chambers's conversation with Phillips created an impression of surveillance. During his August 2 conversation with Phillips, Chambers said that he knew about the July 31 meeting and that he was surprised at the identity of some of the people who had reportedly signed cards.

Mountaineer Steel responds in the same way it did to the General Counsel's allegation of coercive interrogation. The company claims that Chambers was on vacation and therefore could not have made the statements to Williams and Phillips. As noted above, the ALJ acted within her discretion when she discredited the company's evidence that Grover Chambers was on vacation. There was substantial evidence to support the ALJ's finding that Chambers made the statements attributed to him. Accordingly, the Board did not err when it determined that the company created an impression of surveillance.

## C.

An employer also violates section 8(a)(1) of the NLRA when it threatens its employees with discipline or termination in response to union-related activities. *See Grand Canyon Mining*, 116 F.3d at 1044. The Board concluded that the company threatened its employees with termination in violation of section 8(a)(1). The ALJ found that on one occasion, in late July or early August 1996, foreman Harry Chambers told employees Lee Hancock and William Sargent, "If anybody signed a union card, he [will] be laid off or fired." Although Chambers denied making this statement, the ALJ found that he was not a credible witness. The ALJ noted that at the time of the hearing Hancock and Sargent were working for Chambers at a different company. The ALJ therefore concluded that the statements of Hancock and Sargent were more credible because "by testifying to Harry's threat, they undoubtedly placed themselves at risk of economic reprisal." The ALJ also credited Hancock and Sargent's testimony because Hancock testified that Chambers called him at home twenty-eight times in an effort to harass and pressure him into signing a statement that would assist Mountaineer Steel in the current dispute. The phone calls were made from Saturday night on May 17, 1997, to 2:00 a.m. on the morning of May 18, 1997, less than forty-eight hours prior to Hancock's testimony in the hearing. In addition, the ALJ found that Stanley (the company president) told employee Williams that more layoffs would occur unless the "union stuff" did not end. Stanley, Grover Chambers, Perry Miller (Stanley's secretary), and Ronnie Lee Thompson (a security guard) were present and all denied that Stanley made the comment. The ALJ determined, however, that Stanley, Grover Chambers, Miller, and Thompson were not credible on this point.

Mountaineer Steel claims that the ALJ's credibility determinations are unsupportable. It argues that the Board erroneously discredited Harry Chambers's testimony because "it improperly attributed enhanced credibility to Hancock and Sargent due to their current status as employees and the danger that they would suffer economic reprisal." The company cites *Fieldcrest Cannon, Inc. v. NLRB*, 97 F.3d 65 (4th Cir. 1996), for the proposition that credibility determinations should not be based on employee status alone. In addition, the company argues that the ALJ did not offer a sufficient basis to dis-

credit the testimony of Grover Chambers, Miller, Stanley, or Thompson.

The company, however, has failed to point out any "exceptional circumstances" that would compel us to reverse the credibility determinations of the ALJ. *NLRB v. Air Prods. & Chem., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983). Moreover, the ALJ did not discredit Harry Chambers's testimony solely on the basis of the employment status of Hancock and Sargent. Although the ALJ credited Hancock's and Sargent's testimony because they were supervised by Harry Chambers at another company at the time of the hearing, the ALJ cited additional evidence that bolstered their testimony. Specifically, the ALJ noted that Chambers made twenty-eight harassing phone calls in an effort to pressure Hancock into signing a statement favorable to Mountaineer Steel two days before he was scheduled to testify. The ALJ found that this circumstance gave Hancock enhanced credibility. The ALJ acted within her discretion when she credited Hancock, Sargent, and Williams and discredited the testimony of the company's witnesses on the threat determination issue. We therefore hold that substantial evidence supports the Board's conclusion that Mountaineer Steel threatened its employees with unlawful termination.

### III.

The Board also concluded that Mountaineer Steel's discharge of fourteen employees was motivated by antiunion animus and was unlawful under sections 8(a)(1) and (a)(3). The company argues, however, that the employees were laid off because of work slowdowns and that the company therefore acted lawfully when it discharged the workers. Because the Board's conclusion that Mountaineer Steel unlawfully discharged its employees is supported by substantial evidence, we affirm on this issue.

Employers are strictly prohibited from terminating employees because of their union activities. *See* 29 U.S.C. § 158(a)(1), (3); *NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 397-98 (1983). Section 8(a)(3) of the NLRA makes it an unfair labor practice for an employer to discriminate "in regard to hire or tenure of employment or any term or condition of employment to . . . discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). The essential inquiry in a

case of retaliatory termination is whether the employer's actions were motivated by antiunion animus. *NLRB v. Nueva Eng'g, Inc.*, 761 F.2d 961, 968-69 (4th Cir. 1985). "Because motive is a question of fact, we review this finding only to determine if it is supported by substantial evidence." *Medeco Sec. Locks, Inc. v. NLRB*, 142 F.3d 733, 742 (4th Cir. 1998). To prove its retaliation claim, the General Counsel must first establish that: (1) the terminated employee was engaged in protected activity; (2) the employer was aware of the activity; and (3) the activity was a substantial or motivating reason for the employer's action. *See Sam's Club v. NLRB*, 173 F.3d 233, 242 (4th Cir. 1999). Once the prima facie case has been made, the employer may overcome the retaliatory termination charge if it can demonstrate that the employee would have been terminated even in the absence of union activity. *See id.* If, however, "the Board finds that the proffered reason [for the termination] is pretextual, we must affirm the Board if substantial evidence supports this factual determination." *Medeco*, 142 F.3d at 742.

The ALJ found that the employees engaged in a protected activity by participating in the July 31 meeting. She found that Mountaineer Steel was aware of the employees' union activities and discharged employees based on their participation in the meeting and support for the Union. Although the company insisted that it had legitimate reasons for discharging the employees, the ALJ found that the company's justifications were pretextual. The Board adopted the ALJ's decision and recommended order holding Mountaineer Steel in violation of section 8(a)(3). After considering the record, we hold that the Board's determinations are supported by substantial evidence and must be affirmed.

## A.

The Board properly concluded that the employees were engaged in a protected activity. Section 7 of the NLRA empowers employees to "form, join, or assist labor organizations . . . and to engage in other concerted activities for the purpose of . . . mutual aid or protection." *See* 29 U.S.C. § 157. In this case the employees met on July 31 to discuss union representation. Mountaineer Steel claims, however, that the July 31 meeting was not a protected activity. It contends that the purpose of the meeting was to ask the Union to enforce the invalid

1995 Agreement. The company contends that the meeting was unlawful because the 1995 agreement between it and the Union was made at a time when the Union did not have majority support from the company's employees. It argues that the employees did not meet simply to obtain union representation because they signed checkoff cards as opposed to union authorization cards. As the company points out, checkoff cards are signed by employees so that the company may deduct union dues from an employee's salary pursuant to a lawful collective bargaining agreement; they usually are not signed until an employer has a valid contract with the union. The company argues, therefore, that if the employees were seeking representation, and not the enforcement of the illegal 1995 Agreement, the Union would have given them simple authorization cards.

Substantial evidence in the record, however, undermines the company's interpretation of the July 31 meeting. Although the employees were under the assumption that the 1995 Agreement was enforceable, the primary purpose of the meeting was to obtain union representation and to improve the conditions of employment. This activity falls within the protections of section 7. Section 7 expressly protects an employee's right to "engage in other concerted activities for the purpose of . . . *mutual aid or protection*." (emphasis added). The employees' erroneous belief in the validity of the 1995 Agreement does not alter the fundamental purpose of the meeting, which was to authorize the Union to act on their behalf. In addition, the cards distributed at the meeting were not simple checkoff cards. The cards were dual-purpose cards, which can be used by employees to authorize union representation or request the employer to deduct wages, or both. The cards specifically state, "By my signature, I hereby authorize the United Mine Workers to act as my representative in all matters concerning wages, hours, and other terms and conditions of employment." Moreover, it appears that the employees signed the cards simply to authorize the Union to represent them. There is no evidence that suggests that the cards were used to authorize Mountaineer Steel to deduct Union dues. In fact, Jerry Kerns, Jr., the president of Local 1582, testified that the employees wanted to sign the cards "so that [Mountaineer Steel] would know that they was wanting our representation." Because the primary purpose of the meeting was to obtain union representation, the employees' use of the cards was consistent

with the lawful purpose of the meeting—to obtain union representation—and was therefore not illegal.

The Board also reasonably found that Mountaineer Steel had knowledge of the protected activity. The Board determined that the company knew that the employees were engaged in Union activities prior to each round of layoffs. The first round of layoffs occurred on August 2. The Board found that by July 20 the company knew that the Union was engaged in organizing activities. Employee Ben Lambert testified that Jerry Kerns, Sr., a Union representative, showed up at a job site and asked employees if they knew that they were under a union contract. Lambert said that Harry Chambers was present. Grover Chambers's comments to Williams on July 29 or 30 also indicate that the company had knowledge of union activities. Williams testified that Chambers proclaimed, "I thought you was a union radical, and now I know you are." In addition, on August 2 Chambers declared that he knew about the July 31 meeting, and he remarked that he was surprised by the names of some of the people who had signed the checkoff/authorization cards. Also, Williams testified that Stanley told him on August 2 that he was being laid off because of "this union stuff." Moreover, on August 9 Mountaineer Steel's lawyer took possession of the authorization cards. Because the lawyer was in possession of the cards, the Board determined that the lawyer's possession imputed knowledge of the names on the cards to the company.

Mountaineer Steel argues that it did not have any knowledge of union activity prior to the layoffs. It points out that Roy Stanley and Grover Chambers met on July 23 to discuss layoffs. The company claims that although Harry Chambers overheard Kerns talk about a union contract prior to Stanley and Grover Chambers's July 23 meeting, this fact did not give them notice of union activity. In addition, the company reiterates its arguments that the ALJ improperly discredited the testimony of its management staff.

The company's arguments, however, do not refute the substantial evidence that supports the Board's determination. Although the company argues that it discussed layoffs as early as July 23, this fact does not help its case. The record demonstrates that the company had knowledge of union activity before every layoff took place. Layoffs occurred on August 2, 5, 9, 13, and 19. As the Board found, Harry

Chambers, a foreman who assisted Stanley in making decisions regarding the hiring and firing of employees, heard Jerry Kerns, Sr. talk to employees about Union representation on or before July 20. On or prior to August 2 Stanley and Grover Chambers made statements that indicated they were aware of union activities. In addition, the company lawyer took possession of the Union authorization cards only a few days before the final rounds of layoffs. Thus, the Board's finding that the company was aware of union activities is reasonable and is adequately supported by the record.

The Board also concluded that the protected activity was a motivating factor in Mountaineer Steel's decision to terminate its employees. The threats of termination (for example, Harry Chambers's statement to Hancock and Sargent) provide direct evidence of the company's motivation for terminating the employees. *See NLRB v. Hale Container Line, Inc.*, 943 F.2d 394, 401 (4th Cir. 1991) (recognizing that threat of discharge is equivalent of confession of discriminatory purpose). In addition, the company's other antiunion statements (for example, Grover Chambers's statement that those who signed authorization cards would be labeled troublemakers and his statement that Williams was a union radical) demonstrate that the protected activity motivated its decision to terminate employees. Moreover, the fact that the first round of layoffs took place only two days after the July 31 meeting supports the Board's finding that the protected activity motivated the company's terminations. *See FPC Holdings, Inc. v. NLRB*, 64 F.3d 935, 943 (4th Cir. 1995) (noting that the timing of layoffs may be used as evidence of antiunion animus). The record therefore supports the Board's conclusion that the protected activity was a substantial or motivating reason for the company's actions.

For the foregoing reasons, the three elements of a prima facie case of retaliatory termination were established.

### B.

Mountaineer Steel insists that the terminations were business related and were therefore not motivated by antiunion animus. It argues that as early as July 23, 1996, Stanley talked to Grover Chambers about layoffs. The company claims that it has a history of "building up for the [miners] vacation then laying off after it." Thus,

according to the company, the fact that layoffs occurred around the time of August 2, 1996, was simply a normal event in the course of its seasonal operations. In 1996 the company hired fifteen to eighteen new employees from April to June and then laid off fifteen workers at the conclusion of the miners vacation. In addition, it stated that its "new job summaries" demonstrate that there was a significant reduction in work after the miners' vacation period. The company also points out that after the layoffs no new employees were hired for the remainder of 1996. Finally, it asserts that some of the employees were fired for poor work performance.

The Board rejected the company's assertion that the employees were discharged for legitimate business reasons. First, it found that the company failed to prove that it actually experienced a reduction of work after the miners' vacation. In the week before and after the first round of layoffs, most of the employees worked substantial amounts of overtime. Also, the ALJ found that Stanley's and Grover Chambers's testimony that there was not enough work to go around was not credible. In addition, the Board determined that the new job summaries were not probative because the summaries only include hours to be worked on new jobs and do not include any hours worked on older jobs. The Board points out that Mountaineer Steel failed to offer any job summaries that listed the total hours actually worked for the months of August through December 1996. Furthermore, the Board dismissed the company's assertion that employees were fired because of poor work performance. The Board found that none of the employees who were fired were ever notified or disciplined for inadequate work performance prior to their termination. Although some of the employees who were fired had disciplinary issues in the past, their misconduct was excused by Stanley. The Board concluded that the "good ole boy atmosphere . . . prevailed until the employees signed cards for the Union."

Substantial evidence in the record supports the Board's finding that Mountaineer Steel's layoffs were pretextual. Most of the employees were working substantial amounts of overtime hours during the week in which they were laid off, and the company failed to introduce credible evidence of reduced work hours. Although the company introduced its new job summaries, the Board found that this evidence is not particularly probative. The summaries only reflect hours worked

on new jobs and do not include work hours spent on old jobs. More-over, the company's poor work performance justification does not hold up. Again, some of the employees might have had discipline problems, but the company did not seem to care until it learned that these employees were engaged in union activities. Finally, the compa-ny's assertion that it has a history of "building up for the [miners'] vacation then laying off after it" does not have adequate support in the record. The company's employment history demonstrates that it retains most of its workers after the miners' vacation. In 1992 the company employed a total of twelve workers during the vacation and did not lay any of them off at the conclusion of the vacation. In 1993 and 1994 the company laid off only one worker after the vacation period had ended. In fact, the company did not undergo even a modest layoff until 1995, the year before the discharges took place in this dis-pute.

The record therefore shows that the Board's pretext findings are supported by substantial evidence. Thus, we affirm the Board's deter-mination that Mountaineer Steel unlawfully discharged its employees in violation of sections 8(a)(1) and (a)(3) of the NLRA.

IV.

For the foregoing reasons, the Board's petition for enforcement of its order against Mountaineer Steel is granted.

*ENFORCEMENT GRANTED*