**L. S. AYRES & COMPANY, a Division
of Associated Dry Goods
Corporation, Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

**No. 76–1173.**

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 7, 1976.

Decided March 4, 1977.

As Modified April 29, 1977.

Martin F. Payson, New York City (Diane K. Rembleske, Jackson, Lewis, Schnitzler & Krupman, New York City, on brief), for petitioner.

Michael D. Stein, Atty., N.L.R.B., Washington, D. C. (John S. Irving, Jr., Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Allison W. Brown, Jr., Atty., N.L.R.B., Washington, D. C., on brief), for respondent.

Before WINTER, CRAVEN and HALL, Circuit Judges.

**PER CURIAM:**

L. S. Ayres & Company, a division of Associated Dry Goods Corporation (the company), petitions to review and set aside an order of the Board based upon a finding that § 8(a)(1) of the National Labor Relations Act had been violated, and the Board cross-petitions to enforce the order. We conclude to grant enforcement.

The administrative law judge, Herzel H. E. Plaine, found that the company had violated §§ 8(a)(1) and 8(a)(3) of the Act. The Board, however, reversed the administrative law judge with respect to the violation of § 8(a)(3) because the employee discharged was a supervisor. It affirmed with regard to the § 8(a)(1) violation, agreeing that the employer had threatened employees concerning their union activities, had created the impression that union activities were under company surveillance, had coercively interrogated employees concerning the union and had offered wage increases if employees would abandon the union.

Our review of the record persuades us that substantial evidence supports at least some of the findings of violation of § 8(a)(1), and so we grant enforcement.[1] We are constrained, however, to add some additional comments.

Included among the company's acts found to violate § 8(a)(1) was a speech, delivered by Superintendent Joseph Venneman, to employees at three different locations.[2] The substance of the speech dealt with the significance of signing a union authorization card and the various ways in which a union could use the cards to achieve recognition. The Board concluded that the prepared text of the speech violated § 8(a)(1), that Superintendent Venneman departed from the text on each delivery, and that the substance of his departures constituted an independent violation of § 8(a)(1). We disagree with both rulings. First, we do not think that substantial evidence supports the finding that Superintendent Venneman departed from the pre-

---

1. *Inter alia*, there was evidence that, on the eve of the election, supervisors told employees who were openly union adherents that they were entitled to wage increases but that they would be given only a part of the increase because of their "attitude" and if their attitude changed, they would be given the full increase. Subsequently, but still before the election, some union adherents were told that they were being denied their full increase because their attitude was unchanged. An employee who was equivocal about how she would vote in the election was told she could easily be replaced if she voted for the union. Another union adherent, after being interrogated why she was pro-union, was asked how it would be if she went to the parking lot and found her car burned up. She was admonished to think carefully before she decided how to vote. Another employee, in a discussion about company benefits in which reference to the possibility of a strike was made, was asked how she could support her family without a job. Still another employee was told that the employer would give him a better pay increase than he could get through the union.

Singly and collectively, these statements constituted illegal coercion and interference with the employees' right to select a bargaining representative.

2. The pertinent part of the Venneman speech is set forth in an appendix to this opinion.

pared text and in doing so made unlawful threats. Second, there is no claim that the prepared text inaccurately stated the significance of an employee's signing a union authorization card or the uses to which such a card might be put. As we have recently held in *Lundy Packing Co. v. NLRB*, 549 F.2d 300 (4 Cir. 1977), such a speech is protected by § 8(c) and may not be found to be a violation of the Act.

■ In the hearing before the administrative law judge, company counsel requested the sequestration of general counsel's witnesses. The request was refused with the explanation "because I am not convinced that sequestration improves the so-called quality of the evidence my inclination is to disallow it." We agree with the Second Circuit in *NLRB v. Stark*, 525 F.2d 422, 427 (1975), *cert. denied*, 424 U.S. 967, 96 S.Ct. 1463, 47 L.Ed.2d 734 (1976), that sequestration is "a simple and time-tested method for helping to discover the truth [which should] rank high in a list of evidentiary doctrines which courts, under § 10(b), should enforce upon the NLRB." We have in this circuit, however, followed the rule that sequestration is a matter resting in the sound discretion of the Board and its administrative law judges. *NLRB v. Quality & Service Laundry, Inc.*, 131 F.2d 182, 183 (4 Cir. 1942), *cert. denied*, 318 U.S. 775, 63 S.Ct. 831, 87 L.Ed. 1144 (1943). In the instant case we adhere to that rule, and since we are persuaded that even if there was an abuse of discretion the company did not suffer such prejudice as to warrant disregarding all of the evidence supporting a § 8(a)(1) violation, we will not vacate the Board's order on this ground. While new Federal Evidence Rule 615 makes sequestration a matter of right rather than discretion, we do not presently decide the question of the extent to which it is applicable to Board proceedings under § 10(b) of the Act.

■ Finally, we note that in determining questions of credibility the administrative law judge repeatedly assigned as a reason for believing some of the employee witnesses supporting the charges, over company witnesses who denied them, the fact that the employee witnesses "were in the vulnerable position of current employees testifying adversely to their employer and their credibility was entitled to added support," citing *Formed Tubes*, Alabama, 211 N.L.R.B. No. 87 pp. 6–7 (1974), and cases cited therein. *Formed Tubes* was another case decided initially by the same administrative law judge; it, in turn, relied on other Board decisions and *Wirtz v. B.A.C. Steel Products, Inc.*, 312 F.2d 14, 16 (4 Cir. 1963). *B.A.C. Steel Products* is not direct authority for the proposition for which it is cited; it concerned the question of whether, in a suit under the Fair Labor Standards Act, the government could be compelled to disclose the substance of employees' testimony at the discovery stage of litigation prior to trial. We are mindful that § 8(a)(4) proscribes, as an unfair labor practice, the discharge of or any discrimination against an employee because he has filed charges or given testimony in any proceeding under the Act, thereby affording the full protection of the Act to an employee witness. It follows, we think, that the fact that a witness is an employee at the time that he testifies adversely to his employer is at most only a factor bearing upon his credibility and one entitled to little weight unless it is established that he does not know that he is protected in testifying.[3] An overall determination of credibility should not be predicated on the fact of employee status alone; rather, full consideration to the other indicia of credibility should be given. We therefore caution against misapplication of this presumption of truthfulness.

*ENFORCEMENT GRANTED.*

### APPENDIX

The pertinent portions of Venneman's prepared text follow:

---

**3.** An employee who knows that he is protected in testifying may be strongly motivated to establish an employer unfair labor practice. Indeed, some employees may be so motivated even though they are unaware of their protection.

It has come to my attention that the Teamsters are around trying to breed trouble here. We are concerned because some of you may unknowingly sign a union authorization card without getting the real facts about its significance or what it could mean to all of us . . . .

Signing one of these authorization cards is like signing a binding legal document which subjects you to all the obligations of Union membership, including paying union dues, fines, and assessments, obeying strike orders and doing picket line duty. Further, under certain circumstances, the labor board has held that because employees signed a certain number of cards, it was meaningless to have a secret election. The teamsters frequently try to obtain representation in a warehouse based on signed cards rather than on an election. You may ask, how can this be done? First, the teamsters may send us a letter asking that we recognize them. Enclosed with that letter may be photo copies of the signed cards which the Union may have in its possession. If we refuse to recognize them, the Union can do one of several things. They can call a strike for recognition, or they may request a labor board election, or they may request the labor board to make us bargain with them after a hearing without any election. All of you know about strikes and what an election is. Let me explain the procedure where the union tries to do away with the election.

Under this procedure the union gives the signed cards to the Labor Board and accuses the company of unfair practices. The Labor Board will hold an open hearing. Employees who sign cards may be subpoenaed by the Board or the company to testify on the witness stand. These employees will be shown their cards and asked to identify their signatures. Each card signer can then be cross-examined by the company attorney concerning the circumstances under which the card was signed. Later the Board issues a decision.

As you can see, the signing of a card can be very serious. Aside from the fact that it can involve legal proceedings, including testimony by company witnesses and employees, the result can be the loss of a secret ballot election. I do not think that any of us want that to happen.