*67 Enforcement granted in part and denied in part by published opinion. Chief Judge WILKINSON announced the judgment of the court and wrote the majority opinion in parts I through IV, in which Judge MICHAEL joined. Judge LUTTIG joined in the judgment denying enforcement of the salary differential aspect of the Board’s order. Chief Judge WILKINSON wrote a concurring opinion. Judge LUTTIG wrote an opinion dissenting in part. Judge MICHAEL wrote an opinion concurring in part and dissenting in part.
OPINION
WILKINSON, Chief Judge:
The National Labor Relations Board found that Fielderest Cannon, Inc. had committed more than 100 violations of the National Labor Relations Act during a union organization campaign at its facilities in Cabarrus and Rowan Counties, North Carolina. Fielderest offers three responses to these findings: (1) that the ALJ’s credibility determinations were biased in favor of the union; (2) that the Board’s findings on the various violations were not supported by substantial evidence; and (3) that a portion of the Board’s remedy, which required Fielderest to offer union employees the same pay raise given to nonunion employees, exceeded the Board’s power. We agree with the Board that substantial evidence supports the great majority of violations found here and we reject the company’s claims that the agency proceedings were impermissibly biased. We agree with Fielderest, however, that the discharges of Ronald Pharr, Earl White, and Cathy Thompson did not run afoul of the Act. We also agree with Fielderest that the Board was without authority to alter the salary increase agreed to by Fielderest and the union during collective bargaining. For these reasons, we enforce the Board’s order in part and deny enforcement in part.
I.
Fielderest manufactures linens at both union and non-union plants throughout the southeastern United States. In 1986, Field-crest purchased Cannon Mills, a major competitor with 11,000 non-union employees located in Cabarrus and Rowan Counties, North Carolina. On June 12, 1991, the Amalgamated Clothing and Textiles Workers Union sought to organize 6000 employees at these facilities.
The election campaign was hotly contested, and Fielderest took an aggressive approach to convincing employees to vote against the union. Fieldcrest’s campaign literature was graphic. One flier showed a mushroom cloud and the words: “There’s more than one way to destroy a community. VOTE NO.” Another showed a closed mill with the words: “The plant was unionized by ACTWU. The plant was closed for economic reasons in 1985.” Yet another showed workers standing outside a gate near a sign that said “closed.” Its caption read: “In the past decade, scores of textile plants have closed in North Carolina. Thousands of workers have lost their jobs ... Vote NO union.”
Over the course of the campaign and in its aftermath, union supporters suffered numerous incidents of hostility. There were unlawful interrogations, such as when supervisors Reganna Earwood and Ruth Blalock brought Reginald Turner into an office and questioned his support for the union. They suggested that he change his mind by signing a card, which would withdraw his support from the union. When Turner hesitated, he was told that he already had “two points against him” and that failure to sign the card would put him “right out the door.”
There were also threats of reprisal if employees voted for the union, such as supervisor James Allman’s statement that Fielderest would move to Mexico if the union prevailed, supervisor Windy Black’s assertion that the union’s activity would postpone a scheduled pay raise, and supervisor Ted Godfrey’s warning that Fielderest would strictly enforce its rules if the union prevailed. The threats also appeared on fliers. One Spanish language flier warned: “If you sign the [union card] and the Government finds out about it, you will be deported or sent to prison.”
Employees who supported the union were harassed. While Fielderest supervisors Tammy Fox, Eddie Gurley, and Diane Neely distributed pro-company literature during *68 employees’ working time, employees who distributed union literature had their literature seized and were admonished that they could lose their jobs. Supervisors also sought to intimidate union activists by monitoring their work and personal activities though they had not been monitored before the campaign and non-union workers were not so monitored. For example, after the union campaign started, supervisor Perry Harkey tracked union activist Tony Bumgarner “every hour on the hour, watch in his hand.” After Terry Smothers’ wife wrote a pro-union op-ed piece for the local newspaper, Smothers’ movements were restricted to one floor so that his activities could be monitored. Before his wife’s column was published, Smothers freely assisted technicians throughout two floors. Conspicuously, when the union campaign ended, Smothers was allowed to return to his usual duties.
Employees were also punished for their union activities. The day after Sherry Anthony announced her support for the union, she was prohibited from taking coffee breaks outside of her section. Another union supporter, Oreida Clarke, lost her responsibilities as a Spanish language translator because company officials were concerned about what she might tell Spanish speaking employees. And union supporter Sylvia Crawford was removed as a tour guide for new employees — until the union campaign ended.
Ten employees lost their jobs. Elboyd Deal, a 30-year veteran, was disciplined and discharged for speaking out on behalf of the union and for, in the words of supervisor James O’Kelly, acting as the “ringleader” of the organization campaign. At one point, O’Kelly said bluntly: “You see what your union badge is doing for you, Mr. Deal.”
The representation election was held on August 20 and 21, 1991, The final tally showed 3443 votes for the company, 3053 votes for the union, and 307 unresolved challenged ballots. Upon losing the election, the union alleged that the company unlawfully discriminated against 20 employees and committed approximately 109 violations of the Act.
On September 9, Fieldcrest implemented a 5.5% wage increase at its non-union plants. On September 17, Fieldcrest and the union entered into collective bargaining to discuss wages and benefits at the unionized facilities. Fieldcrest initially proposed a 4% wage increase while the union sought a 6% increase. By September 27, Fieldcrest’s offer stood at 4.25% and the union’s counteroffer at 5.5%. On November 4, all benefit issues had been resolved, but the union continued to claim that its employees were entitled to at least the same wage increase received by nonunion employees. When the parties met again on January 12, 1992, Fieldcrest increased its offer to 4.5%, and the union accepted.
The union thereafter brought a complaint under the Act. It claimed that Fieldcrest violated the Act by its conduct during the organization campaign, and also by refusing to grant union workers the same wage increase received by non-union employees. Both claims were consolidated in a single proceeding before an Administrative Law Judge. Trial began on March 31, 1992 and concluded on January 25,1993. The testimony of 256 witnesses extended over 36 days of hearings.
On March 1, 1994, the ALJ issued his opinion. He uniformly found in favor of the union on issues of credibility and held that Fieldcrest had engaged in more than 100 unfair labor practices. The Board affirmed the ALJ’s conclusions. It ordered a new election, required that injured employees be reinstated and made whole, and directed the company to cease and desist from unfair labor practices. The Board also ordered Fi-eldcrest to grant its union employees the same 5.5% pay raise given to non-union employees and to return to the bargaining table over the terms and conditions of employment. Fieldcrest now appeals.
II.
Fieldcrest lodges various objections to the fact-finding process in this case, which we shall consider in turn.
A.
Fieldcrest first presents statistical arguments, which it claims prove that the ALJ’s *69 method for determining the credibility of witnesses was biased. Fieldcrest notes that the ALJ credited all of the general counsel’s witnesses and none of its own; this, it claims, demonstrates bias. Our review shall not be driven, however, by an overall statistical balance of whose witnesses received credit and whose did not. To do so would amount to judging a case by some mechanical formula rather than the merits of the evidence. After all, such statistics do not inform us whether “a credibility determination is unreasonable, contradicts other findings of fact, or is ‘based on an inadequate reason or no reason at all.’ ” NLRB v. McCullough Environmental Services, Inc., 5 F.3d 923, 928 (5th Cir.1993) (citation omitted).
Fieldcrest also argues that the ALJ’s prior record in other eases indicates a bias in favor of labor unions. Fieldcrest cites statistical evidence showing that this ALJ has ruled against employers on 105 of 108 section 8(a)(3) allegations and on 550 of 589 total allegations. The Board counters by noting that of the ALJ’s prior 79 cases, courts have reviewed only 16, and of these 16, courts have fully enforced 13. We will not rate a judge, however, by the percentage of times he or she rules on a given side of a case. To evaluate an ALJ’s impartiality in this way amounts to judging his record by mere result or reputation. In reality, such statistics tell us little or nothing. Fieldcrest’s numbers do not tell us whether the ALJ decided individual cases correctly, and the Board’s figures do not tell us why, in 63 cases, the losing party chose not to appeal.
We shall set aside the statistics. Instead, we shall examine the factfinding in this case to assess whether the record as a whole supports the ALJ’s determinations. A decision-maker’s ruling deserves to rise or fall on the case at hand, not on the results in other eases that have little bearing upon the issues before us.
B.
We thus turn to the instant case. The credibility determinations that Fieldcrest challenges here were the product of lengthy and thorough proceedings during which each party had an ample opportunity to present its respective position to the ALJ. The testimony occupied 36 days of hearings. There were 83 witnesses presented by the NLRB general counsel, 154 by Fieldcrest, and 19 by the union. The testimony of these 256 witnesses filled more than 7800 transcript pages.
The ALJ’s decision reflects careful consideration of this voluminous testimony. In the ALJ’s lengthy, 93-page, single-spaced opinion, he took pains to spell out each violation, the evidence supporting the violation, and his reasons for ruling as he did. His examination of one episode illustrates the care he took. Drenia Smith, an employee, alleged that her supervisor, Terry Burris, threatened her. The ALJ first reviewed Drenia Smith’s testimony that Burris said that the union would mean “friendships would be lost, that people would fire bomb houses, and that there would be strikes and violence,” that picket-line crossers would be beaten, and that “the plant would close down.” The ALJ then summarized Burris’ testimony:
Burris agreed that he had a conversation with Drenia Smith early in the campaign. He agreed that he told Smith that trouble seemed to follow unions, and that it was possible that he told her he had seen reports of firebombing and violence.
Finally, the ALJ analyzed the two witnesses’ testimony. He discussed whether Smith’s testimony had been elicited with leading questions, and determined that it had not. After discussing how Burris’ testimony corroborated many of Smith’s allegations, the ALJ ultimately credited Smith’s testimony.
The ALJ’s review of other testimony was similarly meticulous. Reviewing courts owe deference to such factual findings, assessing them only to determine whether they are supported by substantial evidence. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 488-91, 71 S.Ct. 456, 464-66, 95 L.Ed. 456 (1951). When factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent “exceptional circumstances.” NLRB v. Air Products & Chemicals, Inc., 717 F.2d 141, 145 (4th Cir.1983). Exceptional circumstances include cases where “a credibility *70 determination is unreasonable, contradicts other findings of fact, or is ‘based on an inadequate reason or no reason at all.’” McCullough, 5 F.3d at 928 (citation omitted). Only in such a situation is a reviewing court “free to review the record and independently reach [its] own conclusions.” McCullough, 5 F.3d at 928. Otherwise, careful fact-finding, such as that undertaken in this case, is entitled to respect.
C.
Fieldcrest next contends that the ALJ improperly credited witnesses who testified against Fieldcrest on the basis of their employment status. Fieldcrest notes that on 55 occasions, the ALJ credited 38 witnesses in this manner. In particular, Field-crest objects to the ALJ’s statement that union employees’ testimony was entitled to “considerable weight” in credibility determinations because “it is unlikely that a current employee will testify falsely against his employer.” In L.S. Ayres & Co. v. NLRB, this court rejected such a conclusion, holding that “the fact that a witness is an employee at the time that he testifies adversely to his employer is at most only a factor bearing on his credibility and one entitled to little weight” 551 F.2d 586, 588 (4th Cir.1977) (emphasis added). In Standard-Coosa-Thatcher Carpet Yarn Div. v. NLRB, we reiterated that “the mere fact that an em ployee exposes himself to retaliation by testifying against his employer has little bearing on credibility.” 691 F.2d 1133, 1138 (4th Cir.1982), cert. denied, 460 U.S. 1083, 103 S.Ct. 1772, 76 L.Ed.2d 345 (1983) (emphasis added).
The reason for the Ayres holding is not difficult to discern. It is just as likely that an employee testifying against his employer is also testifying in his own self-interest as a union supporter. As the court pointed out in Ayres, an employee “may be strongly motivated to establish an employer unfair labor practice.” 551 F.2d at 588 n. 3. Employees could be so motivated because of their involvement with the union. Or they might have been subject to discipline from the company, and the finding of an NLRA violation could potentially insulate them from any sanction.
While we thus agree with Fieldcrest that the ALJ erred in giving more than a “little” weight to a witness’ status as an employee, that does not end the Ayres inquiry. As demonstrated in Standard, such an error does not necessitate denial of enforcement if “the record adequately supports the administrative law judge’s credibility determination.” 691 F.2d at 1138. In Standard, the company’s witness never denied mentioning the union in his warning. The court found that the absence of a direct denial sufficiently supported the ALJ’s credibility determination, despite the ALJ’s reliance on the witness’ employment status.
In other cases dealing with questions of credibility, we have also enforced the Board’s orders notwithstanding concerns over the possibility that the ALJ gave more than a “little” weight to the witness’ status as an employee in determining credibility. See Ayres, 551 F.2d at 588; Air Products, 717 F.2d at 141. In Ayres, this court enforced the Board’s order because “substantial evidence supports at least some of the findings of violation of § 8(a)(1).” 551 F.2d at 587. We explained there that “full consideration to the other indicia of credibility should be given.” Id. at 588. In Air Products, we found similarly, holding that the ALJ sufficiently relied upon other indicia of credibility including “the absence of direct denials by Employer’s witnesses, the demeanor of the witnesses, [] the situation surrounding the election campaign,” and other corroborating testimony. 717 F.2d at 145-46.
All of the other indicia of credibility described in Air Products were present here. Quite apart from the employment status of those testifying, there was sufficient evidence for the ALJ to credit the great majority of the union’s witnesses. First, the ALJ repeatedly noted the absence of direct denials on the part of company witnesses. For instance, Graciela Whitley testified that supervisor James Allman told her not to “sign papers for the union” and said that if the union wins, “we will have to move the company to Mexico.” The ALJ noted that Whitley’s testimony was particularly clear. Most *71 importantly though, Allman did not refute the charges. Whitley’s testimony was thus appropriately credited.
On some occasions, the relevant company witness even failed to take the stand. Oreida Clarke alleged that the company posted a notice in Spanish threatening workers with deportation if they signed union cards. Though this allegation was partially credited because of her employment status, the ALJ also noted that the company’s witnesses who denied posting such a notice did not “include all supervisors who may have done so.” Accordingly, the ALJ concluded that the company’s “evidence does not directly rebut Clarke’s testimony that she saw the notice.”
The testimony of company witnesses also suffered from comparative vagueness. Comparative vagueness was central to the credibility determination involving current employee Brenda Lyles, who testified regarding threats of plant closure made by supervisor Howard Hall. While the ALJ did mention Lyles’ employment status, he also compared the witnesses’ respective recall. Supervisor Hall could “hardly remember the conversation,” but Lyles offered detailed testimony. As a result, the ALJ ultimately concluded that Lyles should be credited because she “had much better recall of this conversation.”
Inconsistency was yet another problem for the company’s witnesses. For example, supervisor Perry Harkey denied spending additional time on the floor monitoring employees, yet he simultaneously admitted that management had ordered him “to be available for employees’ questions.” The ALJ noted that because Harkey would have had to spend more time on the floor to be available for employees’ questions, Harkey’s denial that he was spending more time on the production floor undermined his credibility. Consequently, the ALJ credited current employee Tony Bumgarner’s testimony that Harkey had monitored union employees.
Absence of denial, comparative vagueness, and internal inconsistency are factors that may legitimately bear on an ALJ’s decision to credit a company or a union witness. Over the course of his opinion, the ALJ noted that the tinion witnesses’ testimony stood unrebutted on 34 occasions. Likewise, the ALJ mentioned the inconsistent or contradictory nature of company testimony at least 20 times.
To a lesser extent, the ALJ also relied on the demeanor of witnesses, another factor bearing on credibility determinations. Air Products, 717 F.2d at 145. The ALJ stated on the first page of his opinion, “On the basis of ... my observation of the demeanor of the witnesses, I make the following findings of fact.” While presumably, every oné of the ALJ’s credibility determinations hinged on the demeanor of the witnesses, he specifically cited demeanor on two occasions. With regard to Reginald Turner, who testified that his supervisor threatened to fire him if he supported the union, the ALJ cited Turner’s “demeanor” and found his testimony “more truthful” than the company’s witness. Discussing another witness, who denied that Fi-eldcrest’s offer of discounted merchandise to employees was designed to influence the forthcoming union election, the ALJ explained that the company witness’ “demeanor was not that of a trustworthy witness.”
Even where demeanor was not specifically mentioned, it appears to have supported the ALJ’s credibility determinations. Though Sandra Greene’s testimony (regarding Windy Black’s threats that employees would not receive a pay raise because of the union) was credited because she was a current employee, the ALJ also noted that “Greene was a more truthful witness than Black.” And Sharon Davis, who testified that supervisor Don Hancock had monitored union employees, was regarded as a more “credible witness” than Hancock. As the Seventh Circuit explained, “Credibility ... is a function not only of what a witness says but of how a witness says it.” NLRB v. Overnite Transportation Co., 938 F.2d 815, 819 (7th Cir.1991). While some of the ALJ’s assessments of demeanor are certainly general, the balancing of witnesses’ testimony is at the heart of the factfinding process, and it is normally not the role of reviewing courts to second-guess a fact-finder’s determinations about who appeared more “truthful” or “credible.”
Moreover, the ALJ was not remiss in observing that the representation campaign as *72 a whole was marked by an atmosphere of intimidation and hostility toward the union. Fieldcrest posted signs showing a locked gate accompanied by the words: “What do Fieldcrest Cannon’s Bedspread Mill and Sheeting Mill in Eden have in common? Both plants were unionized by ACTWU. Both plants were closed due to economic conditions.” Other fliers detailed the loss of jobs at Fieldcrest’s unionized plants, contained pictures of abandoned facilities, and, as noted earlier, depicted a nuclear explosion with the words “There’s more than one way to destroy a community. VOTE NO.” An atmosphere of reprisal and recrimination against union supporters may provide a context for evaluating the testimony of witnesses and no doubt enhanced the credibility of those who were accusing the company of violations.
Finally, there was also substantial corroborating testimony to support the ALJ’s credibility determinations. When current employee Peggy Jordan testified that managers Buck Reese and Harold Roseman threatened the loss of current benefits if the union was voted in, her testimony was also corroborated by other witnesses. The ALJ noted that Jordan’s testimony was decidedly similar to “statements made to employees by other supervisors.” Given the cumulative weight of different witnesses alleging nearly identical incidents, Jordan’s credibility was enhanced. The ALJ relied on similar corroborating evidence no less than 49 times over the course of his opinion.
The above examples constitute no more than a sampling, but they are sufficient to demonstrate how the ALJ approached his task. He erred in relying on the employee status of the witnesses before him, but there is a great deal of other evidence supporting the conclusions that he reached. We are not prepared to set at naught findings that are solidly grounded in the evidence. Standard, 691 F.2d at 1138. The ALJ’s opinion provides a detailed discussion of why the union witnesses’ testimony was more persuasive than the testimony offered by Fielderest’s witnesses. As a result, it is proper to conclude that the record here “adequately supports the administrative law judge’s credibility determination^].” Id.
D.
In sum, Fieldcrest’s attack on the ALJ’s credibility determinations misses the forest for the trees. Its attack upon the ALJ fails ultimately to divert attention from the central point of this litigation: the overwhelming evidence against Fieldcrest. The vast majority of the 100 plus violations here were not only supported by substantial evidence. The whole of this case is greater even than the sum of its respective parts. Fieldcrest’s threats and reprisals against union adherents included:
unlawful interrogations; a threat of discharge if a union withdrawal card was not signed; threats of lost benefits; threats of disciplinary action; threats of termination; threats of plant closure if employees selected the union; the posting of a threat of deportation to Spanish-speaking employees if they signed union cards; threats of other reprisal; harassment; an order to wear a pro-employer t-shirt; threats of more stringent enforcement of the rules if the union was selected; assignment of additional work; closer monitoring and surveillance of union employees; restriction of union members’ movement; prohibiting employees from engaging in conversation about the union; disparate treatment; and various warnings and discharges that appeared to stem in part from the employees’ union activities.
See Fieldcrest Cannon, Inc. and Amalgamated Clothing and Textile Workers Union, 318 N.L.R.B. No. 54, 1995 WL 516386 (August 25, 1995).
While it is difficult to convey the full weight of the ease against Fieldcrest merely by listing violations and discussing a few examples, the Board concluded that Field-erest’s unfair labor practices were “numerous,” “pervasive,” “outrageous,” “egregious,” and “notorious.” The Board member who dissented on minor aspects of the case agreed with the majority that “the number and pervasiveness of the Respondent’s unfair labor practices warrant remedies beyond those of the ordinary case.” (Board Member *73 Stephens, concurring in part). So too did the ALJ conclude that Fieldcrest “ ‘has engaged in such egregious and widespread misconduct as to demonstrate a general disregard for employees’ statutory rights.’ ” (quoting Hickmott Foods, 242 N.L.R.B. 1357, 1979 WL 9225 (1979)). The record reveals that this is not a strong case from the company’s standpoint. While it is assuredly lawful for a company to oppose the unionization of its workforce, see 29 U.S.C. § 158(c), Fieldcrest simply adopted a scorched earth, take-no-prisoners approach to stop unionization without regard to statutory limitations. The cumulative evidence in this case amply supports the ALJ’s determinations — the kind of ground-floor determinations by a fact-finder to which we would be obliged to defer even under less condemning circumstances.
III.
The broad picture does not, of course, relieve this court from the obligation to review Fieldcrest’s challenge to individual findings of discrimination in violation of § 8(a) of the Act. 29 U.S.C. § 158(a) (“It shall be an unfair labor practice for an employer (1) to interfere with, restrain, or coerce employees in the exercise of [their] rights ... (2) to dominate or interfere with the formation ... of any labor organization ... (3) [discriminate] in regard to the hire or tenure of employment or any term or condition of employment to discourage membership in any labor organization ... (4) to discharge or otherwise discriminate against an employee because he has filed charges ... (5) to refuse to bargain collectively”). While the majority of those findings are supported by substantial evidence, three are not. Ronald Pharr, Earl White, and Cathy Thompson were all discharged for misconduct unrelated to the union campaign. Accordingly, these employees were not entitled to relief under the Act.
A.
Ronald Pharr was discharged for refusing to take a breathalyzer test. One of Pharr’s coworkers, Rosie Robinson, complained to supervisor Percy Smith that Pharr was harassing her. Smith then approached Pharr, and according to Smith, Pharr was “really smelling” of alcohol. According to Pharr, Smith said: “Ron, I smell alcohol on your breath and I’m going to give you a breathalyzer.” After Pharr wandered around the plant for some time and failed to report to the testing room (presumably to diminish his blood alcohol content), Pharr allowed himself to be escorted off the premises without ever submitting to a blood alcohol test. At the hearing, Pharr admitted that he had consumed beer immediately before work. Pharr also testified about two prior incidents of alcohol abuse at Fieldcrest: (1) he came to work “smelling kind of strong” of alcohol and was warned by Smith; (2) he drank so much Cisco (a fortified wine which “gets you high pretty quick”) that he had to be sent home sick because he was too “dizzy” to work. Pharr’s criminal record also includes injuring real property and two assaults, one of a government official. Given Pharr’s own testimony, his termination had nothing to do with the union campaign and everything to do with his own misconduct.
B.
Earl White was discharged for disruptive behavior while working as a probationary employee. White’s behavior was reported from several sources and ranged from murderous threats to sexual harassment. Co-worker Ivey Mosely testified that White had threatened to “shoot” another employee. And White’s supervisor, Jimmy Allen, received at least three complaints regarding White’s violent nature: (1) that White argued with Harold Caldwell and threatened to kill him; (2) that White threatened Kevin Glaseo with bodily harm; and (3) that White intended to harm Abraham Mincer. Fieldcrest was also legitimately concerned about White’s behavior around women. Co-worker Patsy Jamerson testified that White would “grab” women and “touch them” and “say sexual— sometimes sexual remarks to them.” Roslyn Hemphill testified that she endured such harassment and had complained on two occasions to Allen. The cumulative weight of this testimony suggests that White’s termination was not related to his union activity.
*74 C.
Cathy Thompson was discharged for running her towel machine without towels in it, thereby increasing her production and pay. Thompson admitted on the witness stand that she had cheated on production before, and her company records reflected two prior warnings for this behavior. Just before Thompson’s termination, three of her co-workers (Walter Waller, Sam Jallah, and Kelly Walker) reported Thompson to supervisor Reganna Earwood, each alleging that Thompson was cheating on production. According to Walker, Thompson managed more than 500 false runs every night. As a result of these complaints, Earwood eventually caught Thompson cheating on the machine. Given this evidence, we do not think that Thompson’s termination had anything to do with the union campaign.
As the discharge of these three employees did not amount to a violation of section 8(a)(3) of the Act, we decline to enforce that portion of the Board’s order that required Pharr, White, and Thompson to be reinstated and made whole.
IV.
We next turn to the question of remedy. The Board’s order provided an extensive list of remedies in addition to the reinstatement and compensation of those employees who had been discriminatorily discharged or disciplined. The Board ordered that Field-crest: (1) hold a new election off-premises; (2) cease and desist from the unfair labor practices; (3) rescind unlawful company rules; (4) supply the union with names and addresses of its non-union employees; (5) allow the union reasonable access to its bulletin boards; (6) grant the union access to nonwork areas dining employees’ nonwork time; (7) allow the union to respond to company speeches regarding the issue of representation; (8) afford the union the right to deliver a 30-minute speech to employees on working time prior to the election; (9) post notices at its plants of the Board’s findings; (10)publish the notices in various company newsletters and local newspapers; (11) mail the notices to employees; and (12) require a company representative to read the notice to its employees. We agree with the Board that, under the extraordinary circumstances of this case, these steps did not amount to an abuse of the Board’s remedial power. See Monfort, Inc. v. NLRB, 965 F.2d 1538 (10th Cir.1992). We do not suggest that these steps would be appropriate in every case.
V.
We enforce the Board’s order with the exception of those aspects relating to Ronald Pharr, Earl White, and Cathy Thompson and those portions addressing the pay raise differential between Fieldcrest’s union and nonunion employees. As to those matters, we deny enforcement.

ENFORCEMENT GRANTED IN PART AND DENIED IN PART.